## JONES, Appellant, *v.* BROWN.

34  439
66  423

A *donatio causa mortis* is of the nature of a legacy. It becomes valid only upon the decease of the donor.

Where a husband has permitted his wife, without any marriage contract, to retain the possession and control of the personal property she had before marriage, he is, nevertheless, entitled to administration upon her estate, and to retain the balance of the estate to his own use.

The wife's gift of any of her property in her last sickness, and in expectation of death, will, like her will, be valid only by the assent of her husband.

APPEAL from a decree of the judge of probate for this county.

The appellant, by his petition to the court of probate, set forth that on settlement of the account of Stephen Brown, administrator of the estate of Nancy Brown, late of Candia, deceased, a balance of $1274.53 was found in the hands of the administrator ; that Hannah Jones, wife of the petitioner, and six others named, are the only heirs of the estate of the deceased, and prays for a decree of distribution of said balance among them.

At a hearing, after due notice, on the 15th of June, 1853, a decree was made, reciting that it appears that the title to this balance is vested in the administrator, and not in the heirs named in the petition ; that the petitioner take nothing by his petition, and that the same be dismissed.

The appeal was seasonably taken and duly prosecuted.

It is now agreed that Nancy Brown was the lawful wife of Stephen Brown, the appellee, at the time of her death ; that she died in June, 1851, intestate, and that the appellee was duly appointed her administrator, and took upon himself that trust. The administrator claims to hold the balance of the estate as his own property.

The appellant, in behalf of his wife and the others named as heirs in his petition, claims that the balance belongs to them, as next of kin to the deceased. He also claims that the deceased had a considerable personal property, which was never claimed, nor reduced to possession by her husband during her life, but was held by her for her own use, without objection on his part ;

that the property from which the balance results was given by the deceased during her lifetime as a *donatio causa mortis* to the heirs named in the petition, who were her nieces.

These facts were not admitted, and evidence was laid before the court, from which it appeared that Mrs. Brown had a farm and buildings, with a stock of cattle, &c., which she owned and carried on before her marriage, together with household furniture, and some money at interest, and she retained the control and management of her property as long as she lived, without objection from her husband. These facts are not seriously controverted.

The evidence tending to show a *donatio causa mortis* is the testimony of Mrs. Abigail Fitts, in some degree supported by Mrs. Dorothy Morrill.

Mrs. Fitts said: Mrs. Brown deposited her keys with me before her death. During the summer of 1850 she gave me a key, with directions to keep it until after her decease, and then to give it to her nieces, when they were ready to divide the things. She recalled that key two or three times. During the summer before her death, she called for the key, and kept it till a few days before her death, when she wanted me to take it and carry it home; and at that time there were two others with it. Before this, she had several times said she wanted me to take the keys and give them to her nieces, when they got ready to divide the things. A few days before I took them the last time, she wanted me to put the keys where I should know where they were, and where she could get them, if she should want them, and directed me to take them, if she should not live. At the time I took them she sent for me and directed me to take the keys and carry them home. She repeatedly gave me directions to take those keys and deliver them to her nieces after her death. She said nothing of her nieces about the time of her death. In speaking of the keys, she said, " You understand me."

One of these keys opened a case of drawers. I never saw her use but one of them. She opened a case of drawers with that. It was a brass key; one of the others was a common chest key, and the other appeared like a door key.

She said she wanted her nieces to have the things in the house. I was her nearest neighbor on one side, not a quarter of a mile off.

There was money and bedding in the drawers. She took from them the money she gave me for Mrs. Evans, for gravestones, and for her nieces. It was the brass key she gave me, and recalled several times. I took no other key from her except at the last time, and she never gave me any directions as to those two keys; no directions separate or different from what she gave me when she gave me the brass key. The keys were tied together. She carried them about her while she was about the house. When she gave me the keys the last time, she spoke of the keys, as if more than one. She said, "Take the keys; you understand." When she spoke of the things of her's she wanted her nieces to have, I think her expression was, *things in the house.* She said that several times during the summer of 1850. At those times I had only one key. Mrs. Brown left with me a note for her nephew, E. Fifield, which I gave him.

Mrs. Morrill says : I was present just before Mrs. Brown's death, when she gave away her keys. She told me she gave Mrs. Fitts the keys to keep till after she was dead, and then she would give them up to us. She said one of the keys belonged to her drawers, and one to the chest. She told me to remember and have the things divided equally among us sisters.

As to the extent of the supposed gift, there is no evidence for what purpose the large key was used. The brass key opened the drawers said to contain money and bedding. This key remained in Mrs. Fitts hands till it was delivered to the nieces, and whatever was found in the drawers appears to have been divided among them, as there is no controversy in regard to them.

The third key belonged to the chest. It was delivered by Mrs. Fitts to Mr. Brown on the afternoon after Mrs. Brown's death, upon his statement that his pocket book and some of his clothes were locked in that chest. It was never afterwards returned to her.

The controversy mainly relates to the supposed contents of this chest, which is alleged, by the appellant, to have contained certain notes and securities, from which the balance of the administration account is derived.

The evidence as to the contents of this trunk is as follows:

Mrs. D. Morrill, her niece, says: The chest was in the bedroom. I saw it a month or two before Mrs. Brown died, and also a few days after she died. There was nothing in it of any value. It was about two thirds full of old papers, account books, and the like. About the same when I saw it after her death, as when I saw it before. I saw her take some money from that chest in the month of April next before her death. Mrs. Brown took the money from the till of the chest. There were some papers in the till. I did not notice whether they were printed or written, or how they were folded. I don't know where Mrs. Brown was accustomed to keep her money, notes, or valuable papers. The occasion of my seeing the chest opened a month or two before Mrs. Brown died, was this: Mr. Brown came in and wanted to borrow some money.

Harrison Morrill says: I lived with Mrs. Brown in 1846, before her marriage to Brown. She kept papers of different kinds in that chest. I cannot tell exactly what they were. She kept her money and her deeds there, I think. I do not know whether she kept her notes there or not, but suppose she did. She paid me money, which she took from the chest, and I saw deeds lying there.

James Morrill says: I saw Mr. Brown take a note from the till of the chest on the day of the funeral. The note ran to Mrs. Nancy Brown, and was signed by William Patten. It was for forty to fifty dollars. The note was paid to Stephen Brown.

I was present when the heirs met to divide the things after the death of Mrs. Brown. It was about three weeks after her death. The chest was locked, and Mr. Brown unlocked it. We found a few cents in money in the till. The lower part of the chest was half full of receipts, deeds, &c. We found no money or note in the drawers.

Jones *v.* Brown.

*Morrison, Fitch & Stanley*, for the appellants.

The evidence shows that Mrs. Brown kept her personal property and estate separate and apart from her husband's, and free from his control and interference, and that he never reduced it into his possession until her decease, and before his appointment as administrator.

The evidence is sufficient *primâ facie* to show that she kept her notes, money, and valuable papers in the chest, of which she gave the key to Mrs. Fitts. Mrs. Brown gave and delivered her personal property and choses in action to her nieces.

Brown obtained possession of the personal property and choses in action which Mrs. Brown gave to her nieces, through fraud and misrepresentation, and after her decease.

Upon the question of the gift and delivery of the personal estate and choses in action of Mrs. Brown to her nieces, the appellants contend that it was a gift *causa mortis ;* that the delivery of the keys by Mrs. Brown to Mrs. Fitts was equivalent to a delivery of the property and choses in action themselves, contained in the chest and drawers, which the key given to Mrs. Fitts opened.

It has been held in Maine that there must be an actual delivery to perfect the gift, but it may be made to a third person for the use of the donee, if the third person retain possession up to the time of the death of the donor. *Borneman* v. *Sidlinger*, 3 Shep. 429.

It is recognized and laid down in 2 Kent. Com. 446, 7, that the delivery of the key is equivalent to a delivery of the articles themselves, and see cases there cited.

*Marston*, for the appellee, contended that Mrs. Brown never made or intended to make any gift to her nieces of her choses in action, or any property whatever other than the parcels actually delivered to Mrs. Fitts, and also *her things*. According to the testimony of Mrs. Fitts, she expressed a desire that her nieces should have her *things*. By that she meant her apparel, personal ornaments, paraphernalia. The word is used in that sense. Webster's Dict'y, Quarto, *Thing*, 8th def.

The direction to Mrs. Fitts to give to her nieces the money she gave her, excludes the idea of any other gift of money, or choses in action to them. There is no evidence from any source that she ever uttered a word showing an intention to give any thing to her nieces, except the money given to Mrs. Fitts, and her *things*, using the word in the sense above indicated. All that she intended to give her nieces they have received.

All the directions given to Mrs. Fitts were given when she delivered the one key, the brass key, which unlocked her drawers; and it is not pretended that any notes were kept there. She gave no directions, when she delivered the other keys just before her death, and it is not probable that she intended to deliver any other than the brass key, for Mrs. Fitts says they were tied together, so that she probably did not see them.

In order to make out a valid gift *causa mortis*, it must appear that there was a clear and manifest intention of the owner to give a subject capable of passing by delivery, and an actual delivery at the time, in contemplation of death. Notes do not pass as a *donatio causa mortis*, unless indorsed in blank, or payable to bearer. *Parish* v. *Stone*, 14 Pick. 205; 2 chap. Blac. Com. 514, note 45.

Stephen Brown was entitled, *jure mariti*, to the administration of the estate of his wife, and this right belonged exclusively to him; consequently, in taking possession of his wife's estate, he committed no fraud, as the appellant alleges. Williams on Ex'rs 336, 337, and cases there cited; *Wells* v. *Tyler*, 5 Foster 342; *Burleigh* v. *Coffin*, 2 Foster 125.

The husband surviving, the choses in action of the wife belong absolutely to him. *Whitaker* v. *Whitaker*, 6 Johns. 117; 2 ch. Blac. Com. 497, 498.

A married woman cannot make a gift without the license of her husband. 1 Will. Ex'rs 45; *Cutter* v. *Butler*, 5 Foster 350; 2 ch. Blac. Com. 497, 498.

BELL, J. It does not appear, from the evidence laid before us, from what sources or from what description of property the balance on the administration account was derived.

It does not appear that Mrs. Brown had at the time of her death any notes, except that for $40 or $50 against James Patten, which James Patten saw taken from the chest by Mr. Brown, on the day of the funeral, and a note left by Mrs. Brown with Mrs. Fitts for her nephew, E. Fifield.

It does not appear that any note, money, or security for money, was in the chest or drawers, except the Patten note.

If the delivery of the keys to Mrs. Fitts amounted to a gift of *the things* in the drawers and chest, and if *the things in the house* was broad enough to cover money or notes, or securities for money, the gift, upon the evidence before us, would apply only to the Patten note and the articles divided.

It does not even appear that Patten's note forms part of the balance in question.

It would seem that a gift of the key of the chest, accompanied by a direction that her things should be equally divided among her nieces, would be a valid *donatio causa mortis* of notes contained in the chest, because it is conceded that there was nothing else in it of any value. 2 Kent's Com. 446, 7, 2 ; *Smith* v. *Smith*, Strange 955.

If the husband survives his wife he is entitled to administration, and to recover and receive any property in her possession, or to which she is entitled, but which he had not reduced to his possession during her life, to his own use. *Wells* v. *Tyler*, 5 Foster 342.

During the life of the husband, it is not settled by decisions, that we are aware of, how far the power of the wife extends in giving away or disposing of her property.

It would seem a reasonable rule, that where the husband has failed to reduce the property to his possession, from inability, as from its situation, or from want of time, no assent of the husband could be presumed, and the wife would have no power to give away the property.

But where the wife has continued to retain the control and management of her property by the assent of the husband, there her sale or gift of the property *inter vivos* might be effectual.

On this principle her *donatio causa mortis* might be good in such a case, unless the rules applicable to legacies should be held to apply ; and the gift of all the property (notes included,) which were secured by the keys given to Mrs. Fitts, might be valid, though this upon the proof would apply only to the Patten note.

But a *donatio causa mortis* is of the nature of a legacy. It becomes a valid gift only upon the decease of the donor.

Now a married woman, by her husband's assent, may bequeath by will personal property in possession which belonged to her at her marriage, or which has fallen to her afterwards. *Cutter* v. *Butler*, 5 Foster 355. A general assent that the wife may make a will, is hardly sufficient. There must ordinarily be evidence of an assent to the particular will which is made by the wife. The assent may be proved by circumstances as well as by direct proof. Thus, if, after the wife's death, the husband suffer the will to be proved, and deliver the goods accordingly, the testament is good. Ibid. 357. If these principles are applicable, as we think they are, to the case of a *donatio causa mortis*, the husband in this case would be bound by the gift, by his wife, of the things which he saw divided.

But there is no evidence of any assent to her gift of any notes. On the contrary, though his mode of manifesting his dissent was not very manly, yet his disagreement to his wife's arrangements, so far as the notes were concerned, except that perhaps given to E. Fifield, was very clear and unequivocal.

His consent being necessary, the donation consequently fails entirely, and

*The decree of the judge of probate must be affirmed.*