Skillman *v.* Wiegand.

FREDERICK V. D. SKILLMAN, executor &c. of Ebenezer King, deceased,

*v.*

LIZZIE A. WIEGAND.

1. Where an account is opened and money deposited by a father in the joint names of himself and his child, in a savings bank whose by-laws provide for the issuing of a pass-book to each depositor and require its production when money is drawn, the question whether the intention of the parent is to create a joint estate with absolute right of survivorship or merely to make the child his agent for convenience in drawing the money, is to be determined by the circumstances of the case and the conduct and declarations of the parent.

2. Where it clearly appears that such deposit is not merely for the convenience of the parent in drawing money, and not with the intention to make a gift to the child in case of its surviving the parent, a subsequent change of intention and determination to make a gift to the child must be proven by clear and satisfactory evidence. The mere permitting the account to remain in joint names and loose declarations indicating a gift are not sufficient.

Heard on bill, answer and proofs.

*Mr. James D. Manning,* for the complainant.

*Mr. Henry Puster.* for the defendant.

PITNEY, V. C.

The contest in this cause is over the sum of $2,776.99, drawn by the defendant, Mrs. Wiegand, out of the Provident Institution for Savings, known as the Bee Hive Bank, in Jersey City, the day before the death of the complainant's testator, Ebenezer King. The money, at the time, stood on the books of the bank, as shown by the pass-book, in the joint names of the testator and the defendant, by her maiden name of Lizzie A. King. She was the testator's daughter. He died on the 29th of September, 1891, at her house in Jersey City, in his eighty-second year.

The by-laws of the bank provide that the pass-book held by the depositor must be produced when money is drawn.

Skillman v. Wiegand.

The bill alleges that the bank account was opened by the testator in 1875, and that all the moneys deposited therein were his own moneys, and not those of the defendant; that the testator, for convenience to himself, so that moneys could be drawn therefrom without his personal presence at the bank, caused the name of his daughter to be joined with his own in the passbook. The answer admits that the account was opened in the joint names, so that drafts could be obtained without testator's personal attendance at the bank, but denies that this was done for the sole convenience of testator. The answer does not deny the express charge in the bill, that the moneys deposited to the joint account were, at the time of such deposit, the moneys of the testator. The answer further states *that the defendant drew the amount in question from the bank by both the implied and expressed consent and knowledge of the testator.* It further states that the account was kept in the joint names of the defendant and her father, so that, in case of the death of either of the said parties, the survivor could draw the amount due thereon and close the same without the expense of administration or other legal steps. It further charges and insists that the said deposits were made for the sole benefit of the defendant, and that she drew the amount by her father's special instance and request, made to her personally, on the day that she drew the same.

The following facts appeared: For many years prior to the 1st of January, 1891, the testator had been employed at Jersey City at a salary. His bank account commenced on the 2d of December, 1875, with a deposit of $100, and increased by subsequent deposits, mainly in small sums, and additions of interest, from month to month, and year to year, until it amounted, on the 28th of September, 1891, to $2,776.99. He appears to have been a widower for many years, and to have kept house, one or more of his daughters acting as housekeeper, up to the 1st of May, 1891, when he broke up housekeeping and went to live with his daughter Mrs. Wiegand. His family consisted at first of four daughters and two sons, but the sons dying, and, as I infer, without issue, there remained the four daughters, viz., Mrs. Sarah Skillman, the wife of complainant, Mrs. Minnie

Lemont, Mrs. Lizzie Wiegand and Matilda King, a helpless cripple and invalid, who always lived with her father. Mrs. Lemont was twice married; became a widow in 1884, when she came home to live with her father. Shortly after that Mrs. Wiegand married and went to Philadelphia, and lived there until May, 1891. In March, 1891, Mrs. Lemont married a second time, and later went to live with her present husband, leaving her father without any housekeeper except Matilda, who was unable to perform the duties thereof. Shortly after Mrs. Lemont's marriage, Mrs. Wiegand bought a house in Jersey City, and took her father and Matilda to live with her.

The proofs show that the bank account was originally opened in the name of the testator alone, and that several years afterward he caused his daughter Lizzie A. King's name to be inserted in the original book. His object and purpose in making this change was not shown by direct evidence, but the circumstances show that it was done, not for the purpose of making a gift to Miss King, or creating a joint estate with the right of survivorship, but merely for convenience for drawing money. In point of fact, he retained possession of the book and treated the money on deposit as his individual, exclusive property up to at least a very short time before he died. His declarations and conduct all point in that direction, and they are competent for that purpose, as the authorities all agree, especially as evidence was given by the defence of the same character. Be that as it may, no objection was made to their introduction. The deposit in bank constituted his whole property with the exception of a small house and lot which rented for $18 a month, subject to a tax of $55, equal to $4.50 a month, and subject to repairs and insurance, which would reduce its net rent to not more than $12 a month.

On the 13th of January, 1891, while still living in his own house with his daughters, Mrs. Lemont and Matilda, he made his will, giving everything that he had, both real and personal, to his daughter Matilda, her heirs and assigns forever, and then appointed the complainant, his son-in-law, his executor, adding these words:

"And I direct his attention to the fact of there being money

to my credit in the Provident Institution for Savings, in Jersey City."

Before and after the time of making this will, he declared that his intention was that his whole estate, including the money in bank, should go to his daughter Matilda, giving as a reason that she was helpless and that his other children were provided for; and such intention and desire was a matter of general talk and understanding among all the children, and, I am satisfied, was known by the defendant, Mrs. Wiegand.

At the execution of the will testator was advised by the counsel who drew and witnessed it, that it would be prudent for him to have the bank deposit put in his individual name, and afterwards, in the month of March, he took the pass-book to the bank for that purpose, but upon being informed by the officers that such change would involve a loss of interest (the regular dividend days being the 1st of January and the 1st of July), he refrained and left it standing in the joint names of himself and daughter.

About the 1st of April, 1891, after the marriage of Mrs. Lemont, Mrs. Wiegand determined to purchase a house in Jersey City and move there, and to that end wrote her sister, Mrs. Skillman. to make a contract to purchase a certain house and to procure from her father the down money necessary for that purpose; and at Mrs. Skillman's request testator went to the bank on the 8th of April and drew $150, and handed $100 of it to Mrs. Skillman for the purpose of securing the contract for the house, but upon the express condition that it was to be repaid to him, and it was repaid to him by Mrs. Skillman, who procured it from the defendant. This was the last money drawn from the account until September 28th, 1891. The semi-annual dividend of interest was credited as of the 1st of July, and by the draft on September 28th, 1891, interest from July 1st was lost.

The testator was apparently taken sick and obliged to take to his bed only a few days before he died. One of the complainant's witnesses saw him the day before he died, and found him hardly able to speak. Beyond that evidence none is given as to

his physical and mental condition during the last few days of his life, nor as to how the pass-book came into the possession and under the immediate control of the defendant, nor what induced her to go to the bank and draw the money at the time she did. No evidence was given in support of the allegation of the answer that defendant drew the money by the request of her father.

The executor, after the funeral, ascertained that the money had been drawn the day before the testator's death, and then, with a witness, called on Mrs. Wiegand and demanded the money. She declined to give it. He then spoke of the bill for the burial lot and the funeral expenses which he had paid, and she intimated that they would be paid, but declined to give him the money. Neither in that conversation nor in any other did she at any time state on what ground her claim to keep the money rested, but stated as a reason why she would not give it up that she was unwilling it should go into the hands of the complainant and his wife. Matilda King left Mrs. Wiegand voluntarily shortly after her father's death, and went to the Skillmans to live.

Evidence was given of declarations by the testator, made a few weeks before he died, that "they" had compelled him to make a will, but that Lizzie "would down them all." The evidence fails to indicate that the least pressure was brought to bear upon the testator to make the will. On the contrary, it seems to have been strictly in accordance with both his wishes and duty.

The question in this class of cases is whether it was the intention of the creator of the joint estate to give to his joint tenant the right of survivorship, or whether the title was so vested in him in trust for the creator. Where the creator stands in the relation of parent toward the joint tenant, the usual presumption is that the arrangement and intention were that the parent was to have the sole use for his life, with right of survivorship, and the child was to have the right of survivorship. Such arrangements have been quite common in England in dealing with stocks of various kinds, where they have been used to evade legacy duty and pro-

bate fees, but in the absence of the parental relation the presumption is that the donee of the joint tenancy holds as trustee for the creator. In all cases, however, of personalty the courts look at the circumstances and declarations of the creator of the joint estate, made both before and after its creation, in order to determine whether it was made in trust for the creator or as a gift with right of survivorship.

The authorities show that the courts are less disposed to infer a gift from the deposit of money in the joint names of the owner and another, than in the case of vesting stocks in such joint names. The reason of this is obvious. Stock of any kind is an investment, and the certificate is not the evidence of a debt, but of an interest in some business enterprise, and there is little or no room for the motive of convenience. On the other hand, and especially in view of the well-known practice of savings banks to pay money only upon the presentation by the depositor in person of his or her pass-book, the motive of convenience in drawing money without personal attendance becomes at once prominent and a not uncommon purpose in the placing of moneys in bank to joint account. The effect of the creation of such joint account is, in such cases, simply to make the one party the agent of the other to draw the money; and in case of a savings bank the proprietor of the fund, by retaining the pass-book in his possession, retains complete control of it.

The competency of the declarations of the creator of the joint estate, made both before and after its creation, to show his or her intention, is sustained by the following authorities: *George* v. *Howard, 7 Price 265; Rider* v. *Kidder, 10 Ves. 360; Kilpin* v. *Lamb, 1 Myl. & K. 520; Garrick* v. *Taylor, 29 Beav. 79; 7 Jur. (N. S.) 116; 30 L. J. Ch. 211;* and, on appeal, *4 De G., F. & J. 159; 7 Jur. (N. S.) 1174; 31 L. J. Ch. 68; Whitney* v. *Wheeler, 116 Mass. 490.*

In *Kilpin* v. *Lamb, 1 Myl. & K. 520 (1833)*, a wealthy gentleman named Widmore had an illegitimate but acknowledged daughter, who had married a Mr. Kilpin and had four children, who were the acknowledged grandchildren of Mr. Widmore. On August 25th, 1820, he transferred £900 per annum, long

---

---

annuities, into the joint names of himself, Mr. and Mrs. Kilpin and their son, James (W.) Kilpin.   At the same time he made the following entry in his memorandum-book or journal, page 525 :

"Transfer of £900 per annum, long annuity, by Messrs. Ladbroke & Co., from my name to myself, Mr. Kilpin, Mrs. Kilpin, and James Kilpin, made August 25th.   For my use during my life, then to Mr. Kilpin and Mrs. Kilpin, for the benefit of *their children* equally at the age of twenty-one.

"L. A. £900 per annum.   I think James should now relinquish and give up all interest in the above.   January 18th, 1821.

"James is amply provided for under my will; he will not have occasion beyond that.   January 21.

"Equitable division of £900 per annum, long annuity; one-third for life to Mr. and Mrs. Kilpin or the survivor; then to become the property of W. H. Kilpin and C. J. Kilpin, it being allowed to James Widmore Kilpin to take £1,000 out and out.   January 12th, 1822."

In addition to these written declarations, divers verbal declarations, made by Widmore after the creation of the joint estate, as to these long annuities, and also as to other stocks involved in the suit of *Kilpin* v. *Kilpin*, heard at the same time, were proven and read in evidence.   Between this last date and July 26th, 1825, Mr. Kilpin, the husband, and James W. Kilpin, died, leaving James Widmore, the donor, and Mrs. Kilpin, surviving.   On that date, July 26th, 1825, Widmore made a codicil to his will, by which he bequeathed the long annuities to his executors, in trust for his two grandchildren, William and James Kilpin, the complainants, declaring that he had placed the stock in the joint names of himself and Mr. and Mrs. Kilpin and James W. Kilpin, in trust, and directed his executors to obtain possession of the stock.   The daughter survived her father and claimed the stock as survivor.   She died pending suit, and her executor, Lamb, was made defendant in her stead.   The decree was in favor of the children, the complainants, first by Sir John Leach, master of the rolls, and afterwards by Lord Brougham, on appeal, and the declarations of the testator, both oral and written, were relied on by complainants.   The case, in its material aspects, is much like that under consideration.

In *Garrick* v. *Taylor*, *supra* (*1861*), the question was as to the right of survivorship to forty shares of bank stock, which had been transferred by a Mrs. Grazebrook into the joint names of herself and a Miss Leigh. Evidence was admitted of the declarations of Mrs. Grazebrook as to her object in so transferring the shares, and it was held, first by the master of the rolls and afterwards, on appeal, by the lord-justices (Knight Bruce *dubitante*), that the survivors were entitled. The decision was based upon the effect of the parol declarations of Mrs. Grazebrook. Miss Leigh had lived many years with and been supported by Mrs. Grazebrook, and called her " aunt."

In the more recent case of *Fowkes* v. *Pascoe*, *L. R. 10 Ch. App. 343* (*1875*), a rich lady who had large sums of stock standing in her name, and who had no children or descendants, and centered her affection upon the children of her deceased son's widow by a second marriage, purchased from time to time small amounts of stock and had it transferred to the joint names of herself and a son of her daughter-in-law, who had lived with her and was supported by her. Sir George Jessel, as master of the rolls, held him as a trustee for her executors, but the lord-justices gave him the stock upon inferences drawn from the circumstances of the case.

In *Marshall* v. *Crutwell*, *L. R. 20 Eq. Cas. 328* (*1875*), there was a bank account opened by a husband in the joint names of himself and wife, and so kept by successive deposits and drafts. The balance due upon it at his death she claimed as his survivor. Sir George Jessel, as master of the rolls, gave it to the husband's estate upon the inference from the evidence that it was kept in their joint names for convenience in drawing money. He states the law thus : " The mere circumstance that the name of a child or a wife is inserted on the occasion of a purchase of stock is not sufficient to rebut a resulting trust in favor of the purchaser, if the surrounding circumstances lead to the conclusion that a trust was intended. Although a purchase in the name of a wife or a child, if altogether unexplained, will be deemed a gift, yet you may take surrounding circumstances into consideration so as to say that it is a trust, not a gift. So, in

the case of a stranger, you may take surrounding circumstances into consideration, so as to say that a purchase in his name is a gift, not a trust."

In *In re Gadbury, 32 L. J. Ch. 780 (1863)*, government stocks were purchased with the money of a husband in the joint names of the husband and wife. Before his death a portion of it was sold out by the joint act of the husband and wife, and the money taken by the wife and in her possession in the house at the time of his death. It was held that the money so drawn belonged to the husband's estate, but that the stock remaining belonged to her by survivorship.

In our own state we have the case of *Schick* v. *Grote, 15 Stew. Eq. 352*, decided by Chancellor Runyon in the prerogative court. There a husband deposited moneys in a savings bank to the credit of himself and wife, who survived him and took out letters of administration on his estate. The question was whether she should be charged as administratrix, with the money standing at his death to their joint account. The learned chancellor, affirming the orphans court, held that she must be so charged, basing his judgment on the ground that the circumstances showed that the case in its inception was one of trust for himself and not of gift to his wife. He further found that the evidence failed to show with sufficient clearness that there was any subsequent change of the equitable title by a gift from the husband to the wife. There was in that case, as here, declarations by the husband, sworn to by a witness, which tended to show a subsequent gift. The learned chancellor cites *Brown* v. *Brown, 23 Barb. 565*, and *Marshall* v. *Crutwell, supra*, and both are strongly in point. In the former the court found that it was probably the desire of the husband that his wife should have the fund as his survivor, but that he had not taken the proper means to perfect the gift.

To the same effect are *Taylor* v. *Henry, 48 Md. 550; 30 Am. Rep. 486;* and *The Matter of Bolin, 136 N. Y. 177;* and see *Thornt. Gifts § 335.* Other authorities are cited in *21 Am. Encycl. L. 730.*

The evidence in this case shows clearly that the joint account

Skillman v. Wiegand.

was opened and maintained by the testator solely for convenience, and that it was not at any time prior to May 1st, 1891, the intention of the testator to make a gift of the fund to the defendant. The testator lived with defendant from May to the date of his death, and upon his death-bed was under her complete control, so that she had ample opportunity to obtain possession of the pass-book without his consent. By her answer she fixed the date of the actual tradition by her father to her of the pass-book, and direction to draw and keep the fund, on the day before his death. No proof was offered of such tradition or direction to draw the money, though her husband was living with her and was an available witness. Moreover, when called upon for the money by the complainant she did not put herself upon the ground of a recent gift of the money.

Reliance is placed for proof of the intention to give upon certain declarations made by testator a few weeks before his death. Applying to these declarations the rules adopted in the cases last above cited, and by the court of errors and appeals in *Smith* v. *Burnet*, *8 Stew. Eq. 314* (at *p. 323*), I come to the conclusion that they are insufficient to prove a gift. They were proven by the husband of the defendant and a nephew of the testator, John King, and his housekeeper, Miss Closs. They amount to no more than this, that the house devised was enough to support Matilda, and also that the defendant would " down them all," or " beat them all." There is no proof of any declaration of gift to the defendant or in her presence, nor of any delivery of the pass-book, which, as we have seen, was in his hands up to the date of the withdrawal of the money.

No question was raised as to the jurisdiction of this court. Counsel no doubt relied upon the fact that a trust and accounting were involved.

I will advise a decree that the defendant pay to the complainant the sum of $2,776.99, with interest from the 28th of September, 1891. Complainant is entitled to costs.