FRANCIS J. SWAYZE, executor, &c.,

*v.*

HARRIET M. HUNTINGTON et al.

[Decided June 4th, 1913.]

1. Evidence *held* insufficient to show a delivery by a donor of shares of corporate stock with the intention of divesting himself of all dominion over them.

2. To establish a gift *inter vivos* there must be a donative intention on the part of the donor, actual delivery of the subject-matter, except in case of a chose in action, in which the delivery must be of the character of which it is most capable, and the donor must devest himself of all dominion over the subject-matter.

Swayze *v.* Huntington. *82 Eq.*

On final hearing. On bill, answer, replication and proofs.

*Mr. Edward M. Colie,* for the complainant.

*Mr. John R. Hardin,* for the defendant Edwin W. Merriam and others.

*Mr. Edward S. Atwater, Jr.,* and *Mr. Charles E. Littlefield* (of the New York bar), for Harriet M. Huntington and others.

*Mr. William A. Smith,* guardian *ad litem* of infant defendants Carlisle R. Lane and others.

*Mr. Thomas P. McKenna* and *Mr. John W. Sheehan* (of the Massachusetts bar), for Charles R. Lane.

*Mr. Thomas M. Kays,* for Edward M. Dutcher, guardian.

HOWELL, V. C.

The bill in this case is in form a bill filed by the complainant as sole surviving executor and trustee under the will of Henry W. Merriam for a settlement of his accounts and those of his deceased co-executors, and the ascertainment of the balance in his hands. As incidental thereto and part thereof it was prayed that the court might ascertain whether certain persons who were made defendants to the suit were accountable for the value of shares of stock of the H. W. Merriam Shoe Company which stood in the name of the testator on the books of the company at the time of his death, or for any part thereof, and, if so, what part; and whether a certain attempted gift of the same by the testator was perfected or not in his lifetime. There was likewise a prayer for the discharge of the trustee.

The principal question raised by the pleadings and presented by the evidence is whether the testator made a gift *inter vivos* of certain shares of stock of the said shoe company. This question affects the question of the accounting in this respect. If it shall be found that the gift of the shares was perfected, then the complainant is exonerated from accounting for them; if, on the

other hand, it is found that the gift was not perfected, then the legal title to the shares remains vested in the complainant in his trust capacity, and they must be accounted for as assets of the estate.

The salient facts are these : The testator had a sister who lived in Hyde Park, Massachusetts, who came to Newton, in the state, the home of her brother in 1897, and lived in his family as a member of it until the time of his death. Some time in that year he gave her a large envelope with eight small ones enclosed in it, and directed that the small envelopes should be delivered by her to the various parties to whom the same were addressed. He asked her to take charge of them and deliver them to the parties, but stated that he would like to have it done quietly, as he did not feel able to bear a great deal of excitement, and that she should use discretion so as to avoid any public comments that he might be forced to listen to. Mrs. Huntington accepted the package and placed the same in a safe which belonged to Mr. Merriam and which stood in his house in a small room on the second floor, sometimes called the office. This safe was used by both Mr. Merriam and Mrs. Huntington; both had keys to the outside door, and by means thereof had access to the interior of the safe. Mr. Merriam kept his valuable papers, such as bonds and mortgages, &c., in a private compartment in the safe, to which he only had the key. He assigned to Mrs. Huntington another portion of the safe for her private and separate use, to which she only had the key. This assignment to her appears to have been made shortly after she became an inmate of her brother's family. It does not appear that any of the witnesses ever saw the contents of these eight envelopes; the only evidence on that subject is the very slight evidence given by Mrs. Huntington on page 256 of the state of the case, in which she says that on that occasion he spoke of his shoe company's stock and said that he proposed to distribute some among his relatives, and that she was directed to see that they had it, and that it was to be distributed at her discretion.

Several weeks after this first deposit, if it may be so called, and early in the month of March, 1898, Mr. Merriam remarked to Mrs. Huntington that his wife had died, that he had no children,

that he had just made a codicil to his will which had revoked the provisions of that instrument concerning the disposition of his shoe company's stock so that it was "released," as he put it, from the operation of the will, and that he desired to change the arrangement of the certificates. Thereupon, at his request, she delivered to him the large envelope containing the eight small ones, which he took out of her sight. Several weeks later, perhaps two or three, Mr. Merriam and Mrs. Huntington met in the so-called office at the house, on which occasion he gave her another large envelope, describing orally its contents, which consisted of small envelopes, each containing an endorsement of the name of a person. On the witness-stand she stated the substance of her conversation with him at that time. She says that he directed her to take charge of the envelopes and deliver them at her discretion, for the reason that he wished it done rather quietly, and not to have a public announcement of it, which might bring excitement to him or compel him to listen to all the public might say about it, and that he thought she could so arrange it; and, continuing, he said, "There is an envelope with your name on, and you can receive it now." And opening it, she found therein a certificate of the shoe company's stock for five hundred and sixty-eight shares, which he said he hoped she would live to enjoy. The small envelope which had been addressed to Mrs. Huntington was destroyed, and on the same day, or the next, she obtained a new envelope into which she put the certificate for five hundred and sixty-eight shares, sealed the same, wrote her own name on the address side, placed the same in the large envelope with the others, and then deposited the large envelope in her private drawer in her brother's safe, locked the same and retained the key in her possession from that time forward until the testator's death. She occasionally opened this private drawer between that time and the date of her brother's death, and probably occasionally removed the large envelope therefrom for the purpose of rearranging the contents of the compartment, but she retained the actual custody and possession of the package as she originally received it, and at the date of the death of her brother it was still in her possession. On the day of the funeral, and after the burial, there had assembled at the house a number of relatives

of the family, and among the others, decedent's brother, John J. Merriam, William L. Dutcher and the complainant, who were the executors of the will. John J. Merriam called upon Mrs. Huntington to produce Mr. Merriam's private papers. She must in some way have obtained the key to the testator's private compartment in the safe, because she appears to have produced papers therefrom, and at the time of their production and delivery to her brother, John J. Merriam, she delivered to him the large envelope containing the nine small ones, including the one addressed to herself, all of which he took out of the room with him. Fifteen or twenty minutes later Mrs. Huntington received the envelopes again into her possession from William L. Dutcher, now deceased, who was one of the executors, to whom they had apparently been delivered by John J. Merriam, and who said that it was thought proper, inasmuch as she had been custodian of the papers, that she should present them to Judge Swayze in the presence of those who were to hear the reading of the will. To this she assented, and, at the time of the reading of the will, she gave them to Judge Swayze, but she does not remember that a word was said by either of them about it at the time. From that time forward the envelopes remained in the possession and custody of the executors of Mr. Merriam's will, until the distribution thereof in accordance with the arrangement made on March 26th, 1901, by Exhibit C 8, called the indemnity agreement.

Down to the date of the indemnity agreement it does not appear that anybody had full knowledge of the contents of all the nine envelopes. They are mentioned in the indemnity agreement as containing certificates of shares of stock of the shoe company, but without mentioning the number of shares in each. It now appears that the envelopes which contained the names of James E. Warbasse, George L. Dutcher and John Tozer contained their several promissory notes which had been long before made to the order of the testator, with shares of the stock of the shoe company as collateral security for the payment of the notes; and at the hearing it turned out that those represented transactions by which these three men purchased stock in the shoe company from Mr. Merriam, gave their notes thereof, and transferred back the shares so purchased as collateral security for pay-

ment of their notes. The other six envelopes contained nothing but certificates of shares in the shoe company.

Under this state of facts were the so-called donees entitled to the shares of stock certificates and notes which were enclosed in their respective envelopes at the time of the death of Henry W. Merriam?

I pause at this point to say a word about the so-called indemnity agreement. In 1901 it seems to have been considered advisable, or at least desirable, that there should be a distribution of the stock certificates which were contained in the envelopes among the persons who claimed to be entitled thereto. Such distribution was made by consent of all the persons who were of full age, but could not be consented to by the Lane children or the youngest Dutcher child because of their minority. Mrs. Huntington and her brother, John J. Merriam, thereupon indemnified the executors in the manner set out in the indemnity agreement against any loss which might accrue against them by reason of such distribution. I do not find that this agreement has in any respect varied, changed or altered any of the rights of any of the parties of this litigation as those rights stood at the time of the death of the testator. I consider the agreement as one of mere indemnity and as an instrument to which the complainant may resort in case any claim shall be established against him by the infant defendants to this suit. In my opinion the rights of all these parties are to be adjudicated upon as of the date of the testator's death, and I do not find that anything was done by the agreement which has abrogated any of their rights.

The claims made by the so-called donees of the shoe company's stock rests entirely upon a conversation or conversations had between the testator and Mrs. Huntington, who is one of the claimants. If under the rule of evidence established by section 4 of the act of 1900 her testimony shall be held to be inadmissible, then the whole claim of the so-called donees must fail, for then there would be no evidence of either a donative intention on the part of the testator or of the delivery of the subject-matter of the so-called gift. Her evidence was admitted for reasons stated on page 168 of the record. The case

upon which reliance was then placed (*McKinley* v. *Coe, 66 N. J. Eq. (21 Dick.)* 70) seems to have been approved by the court of errors and appeals in the case of *Cowdrey* v. *Cowdrey, 71 N. J. Eq. (1 Buch.) 353; affirmed, 72 N. J. Eq. (2 Buch.) 951,* under circumstances which point to the applicability of its principles to this case. I must say, however, that the question of the admissibility of this testimony is very obscure, and I admitted it with a degree of doubt which fully justifies a review by the court of last resort. A well-considered case on the other side of the question is *Van Wagenen* v. *Bonnot, 72 N. J. Eq. (2 Buch.) 143.*

But accepting Mrs. Huntington's evidence, and giving it the full force and effect of undoubted admissibility, does it demonstrate the facts necessary to the establishment of a completed gift of the shares in question? The general subject of gifts has been dealt with by the courts of this state, including the court of last resort, so many times and under so many circumstances that there can be no question about the rule which prevails in this jurisdiction, I adopt in its entirety the conclusion reached by Vice-Chancellor Bergen in his opinion in *Taylor* v. *Coriell, 66 N. J. Eq. (21 Dick.) 262,* which holds that in order to establish a gift *inter vivos* the following factors must appear— *first,* a donative intention on the part of the donor; *second,* an actual delivery of the subject-matter of the gift except in cases where it is a chose in action, like a certificate of shares of stock or evidence of indebtedness, in which case the delivery must be of that variety of which it is most capable (*Matthews* v. *Hoagland, 48 N. J. Eq. (3 Dick.) 455*); *third,* the donor must strip himself of all ownership and dominion over the subject-matter of the gift. These requisites appear in all our cases. *Stevenson* v. *Earl (Court of Errors and Appeals), 65 N. J. Eq. (20 Dick.) 721.* There is no difficulty in ascertaining what the law is. The ascertainment of the facts and their application to the well-settled rules of law constitute the difficulty in this case.

Let us suppose then that Mrs. Huntington's evidence is clearly admissible and that we have it before us as the basis of ascertaining the fact as to the gift. Let us take her testi-

mony and apply to it the ordinary tests which prevail for ascertaining its credibility, truthfulness, good faith and reliability. In other words, admitting her testimony, let us ascertain how it on its merits bears out the claims of the so-called donees. There is one matter, however, which ought to be alluded to before touching the merits. Mrs. Huntington's testimony was given in December, 1912; it relates to the conversations which took place in 1907 and early in 1908. As far as the testimony shows she had no occasion to recall these conversations until after the death of her brother, the testator, which occurred in October, 1900, at which time, or soon thereafter, she did have occasion to notify the executors of Mr. Merriam's will, of the circumstances under which she became possessed of the shares of stock in question. She appeared at the time of the hearing about sixty years of age. She is now called upon to give, in the greatest possible detail, an important conversation had with her brother fifteen years or thereabouts previously, without having made any note or memorandum of it, or having in her possession anything corroborative of these details. She has a vital interest in stating the conversations in such a manner as to favor her own pecuniary advantage, because upon her statement depends the question whether she shall receive five hundred and sixty-eight shares of the stock in question. This is not referred to for the purpose of charging Mrs. Huntington with any willful or intentional variation from the truth, but to demonstrate the care with which her evidence must be examined, and the weight that should be accorded to it.

Again, I do not see how the events which attended the first so-called delivery to Mrs. Huntington in 1897 cut any figure in this cause, except possibly to indicate that Mr. Merriam then had in mind the idea that he could withdraw the gift at any time, arguing therefrom that he might have had subsequently the same idea concerning his right to interfere in the second delivery. But in view of my findings, which will be stated later on, I do not see how anything that was said or done on that first occasion can affect in the slightest degree the real issue made up by the pleadings.

We come now to the discussion of the case upon its merits. I have no doubt of the donative intention which influenced Mr. Merriam in placing the stock in question in the hands of his sister. I think that he undoubtedly meant that the six persons whose names appeared upon the envelopes containing the certificates of stock, and the three persons whose names appeared upon the envelopes containing their several promissory notes, with certificates of stock as collateral, were meant by Mr. Merriam to be his beneficiaries, to the extent indicated by the number of shares and notes contained in their respective envelopes. This leaves open only the question of delivery and the subsidiary question whether the so-called donor, in case there was a delivery, stripped himself of all control and dominion over the shares in question. I feel no hesitation whatever in declaring that there was no delivery of the certificates of stock contained in the nine envelopes, either to Mrs. Huntington herself or to the other eight persons whose names appeared upon the envelopes. All the shares of stock contained in the nine envelopes had the proper endorsements for transfer on the books of the company, so that if there had been an actual delivery a valid and legal transfer could have been made without further writings; but such transfers were not made, and the shares of stock continued to stand in the name of Mr. Merriam and did so stand at the time of his death. In my opinion it would have been entirely competent and lawful for Mr. Merriam to have demanded and received back into his possession all the certificates which he had handed to his sister, and to have made sale of the shares and delivery of new certificates therefor, or have made such transfers thereof on the books of the company as he saw fit. The delivery of shares in a corporation is symbolical, for the reason that the shares themselves being intangible are incapable of actual tradition from hand to hand. This symbolical delivery is effected by a tradition of the certificate as a symbol of the shares. I do not think that the delivery of the certificates to Mrs. Huntington, with instructions to deliver them to the parties named, in her discretion as to time, is such a delivery *in præsenti* as carried title immediately to the persons whose names were severally endorsed upon the

envelopes. If any relation of agency was created by the trans-
action it was Mrs. Huntington's agency for Mr. Merriam. It
could not well have been an agency in favor of the intended
donees, because with the exception of Mrs. Huntington they
knew nothing of the transaction. Neither do I find in these
circumstances the creation of a trust in Mrs. Huntington in
favor of the intended donees. The testimony of Mrs. Hunting-
ton upon which the so-called donees must rely is explicit on
the point of the time of delivery. There was no direction to
make the delivery immediately, or as soon as possible, or in
the ordinary round of events, or within any particular period.
It was to be done at her discretion, and the reason of confiding
such wide discretion in her was apparently the fact that Mr.
Merriam's health was not good, and that he did not desire to
encounter the comments of the people on his action.

It is well to keep in mind the fact that the whole case on the
part of the donees rests upon the recollection of Mrs. Hunting-
ton of an important conversation which took place many years
ago. A careful examination of her testimony convinces me
that while she intended to state the exact facts, her memory of
the circumstances is notably defective, and on some important
points contradictory and uncertain. It is a kind of testimony
which I hesitate to take as the basis of a decree to dispose of
property of the approximate value of $99,000.

The case of *Young* v. *Young, 80 N. Y. 422,* presents a strik-
ing parallel to the case at bar. In that case the donor owned
municipal coupon bonds which upon his death were found in
two packages enclosed in envelopes upon which were endorsed
memoranda signed by him describing the bonds enclosed by
numbers, and stating that certain of them belonged to his son,
William, and others to his son, John. Then followed a state-
ment of which the following is a copy: "But the inst. to
become due thereon is owned and reserved by me for so long as
I live, at my death they belong absolutely and entirely to them
and their heirs," using the phrase "absolutely and entirely" in
one case and "wholly and entirely" in the other. The envelopes
were placed in a safe which belonged to the donor, to which
William H. Young had access, and they were found there at

the time of his death. The court of appeals held that the donative intention appeared, but that there was no delivery and no intention to deliver the bonds because it was necessary that he should have them in order to collect the interest which he had reserved. The testimony shows that the donor had cut off the coupons, and that on some occasions his son, William, assisted him in so doing, but that William never asserted any ownership over the bonds as against his father. The court says: "This is the substance of all the testimony by which the delivery to the donee is sought to be established. It shows that the deceased at no time parted with the possession or control of the bonds, but merely confirms the intention expressed in the memoranda. The change of the position of the bonds in the safe where they were kept, from the pigeonhole to the compartment, might have been significant had William been the only donee and had the intended gift been accompanied by any reservation. But under the existing circumstances it cannot be construed into a delivery of the bonds. * * * The memorandum on each envelope says that the interest to become due on the bonds is 'owned and reserved' by the donor. This interest up to the dates of its maturity of the bonds respectively was represented by coupons attached to the bonds. It clearly could not have been intended to deliver them, for so many of them as might become due during the life of the donor were reserved from the gift, as the interest was expressly declared to be 'owned' by the donor, and not parted with. The possession of these coupons was necessary to enable him to collect the interest, and he availed himself of it for that purpose from time to time. No intention was manifest to deliver up these vouchers, and look to the donees for the interest. No division of the coupons could be made, for the period of the donor's life was uncertain; and, further, if all the coupons were retained by the donor they might not represent the entire interest reserved by him."

The opinion likewise contains an argument to show that no trust was created. I fail to see any difference between the reservation of the interest in the *Young Case* and the actual taking of the dividends in this case. The action of the donor in each case demonstrates his intention to retain control of the

fund until his death, and thus perform a testamentary act without the formalities attending the execution of a will.

But it may be said that Mrs. Huntington's certificate stands on a different basis from that on which the others stand. She testified that when the nine envelopes were laid out before her by her brother, and she found that one was addressed to her, he said to her "there is an envelope with your name on, and you can receive it now," and that she then opened it and thanked him for what she found therein, namely, a certificate of the stock in the shoe company for five hundred and sixty-eight shares. Perhaps if this fact stood alone, and it were supported by competent legal evidence, it might be sufficient to carry title, upon the ground that there was a delivery to her at that time. She could then have taken the certificate and had the shares transferred on the books of the company and she would have been the undisputed owner. But instead of accepting the intended gift, she treated her own certificate in the same manner in which she treated all the others. Having destroyed the envelope in which Mr. Merriam had enclosed it, she on that day or on the next day, re-enclosed it in another envelope which she provided herself, endorsed her name on it in her own handwriting, laid it away with the other envelopes, and after Mr. Merriam's death delivered it to the executors without making any special claim for it. These acts seem to me to negative the idea that she considered that there was at that time a delivery to her.

There are, however, other objections which apply to all the certificates and which lead me to the final conclusion that Mr. Merriam did not intend to surrender his control of the shoe company by means of a gift of his stock holdings until his death should supervene, and that he did not do so. He was the holder and owner of one thousand and eighty shares of the stock; this gave him control. By the scheme of gift which he had projected he had placed all his holdings in these nine envelopes, and he must have known as a business man that if the envelopes were delivered and the stock transferred he would have been ousted of his control of the corporation and of all interest therein. All his actions thereafter negative any such

intention. In addition to the non-delivery during his life-time the circumstances show that he not only intended to but did retain control of the shares in question. He voted on them at the annual meetings of the company; he received the dividends and accounted to no one therefor; he continued in control of the company in the same manner in which he had controlled it for many years previously. Mrs. Huntington owned at the time of this transaction twenty shares of the stock which stood in her name on the books of the company. She received her dividends regularly on these shares, but she neither received nor demanded the dividends on the five hundred and sixty-eight shares, the certificates for which were contained in the envelope. The account of Mrs. Huntington on the books of the company printed on page 357 of the state of the case shows this to be a fact.

It will therefore be seen that the donee in this case, even though there were a donative intention and a symbolical delivery, did not strip himself of all dominion and control over the subject-matter of the gift, nor indeed do I think that he meant to do so. The case of the so-called donees must therefore fail, and the stock in question must be declared to be an asset of the estate, for which the complainant must account.

The complainant for his indemnification can at once apply the securities held by him in pledge to make up the deficiency contemplated by the indemnity agreement. If, however, it should be necessary for him to resort to that agreement after the application of the fund pledged, it may be doubted whether jurisdiction over a cause of action arising thereunder exists in this court. Primarily a suit on such an agreement would lie only in the common law courts, but I do not deem it necessary to decide this point at the present time. It may be reserved on the decree and dealt with when the necessity arises.

There is no objection to permitting the trustee to resign, but a decree to that effect cannot be made until the passage and allowance of his accounts.

I will advise a decree in accordance with those conclusions.