On January 16th, 1930, Otto Walch died, testate, leaving, amongst other property, the sum of $13,670.07 in a savings *Page 266 
account which he kept at the First National Bank of Lyndhurst, New Jersey, the complainant herein. Defendant Rutherford Trust Company, as the executor of his estate, claimed this fund as part of his estate, while defendant Lucy Szableski claimed it as a gift inter vivos to her; whereupon complainant filed its bill of interpleader. The question here presented is as to the true ownership of this fund.
From the undisputed testimony it appears that the decedent, when about thirty years of age, had emigrated from Germany to the United States, where he continued to reside until the time of his death, when he was almost seventy years of age. At first he took up his residence in Pittsfield, and then in Scranton, Pennsylvania, from where he finally moved to Lyndhurst, New Jersey, taking up his residence on the second floor of the building known as No. 748 Jersey avenue, which was owned by defendant Lucy Szableski and her husband, who occupied the apartment on the first floor thereof. It was in these premises located almost within a stone's throw of the Delaware, Lackawanna and Western railroad shops, where he was employed, that the testator lived during the last twenty-three or twenty-four years of his life.
While living there, it seems that fate was very unkind to him, for one misfortune after another befell him. First two of his children died, then his wife passed away, and finally Richard, his only remaining child, was also summoned by death, leaving him all alone, without family or kin, in this country. However, he continued to maintain this same apartment, where he lived a lonely, almost isolated, life. Aside from a sister, a niece and the latter's children, all of whom resided in Germany, he had no relatives or kin. He had but one intimate friend, Greenwald, whom he had appointed as sole executor under the will which he had made in 1927.
Despite his moderate earnings, his constant application to work and penurious mode of living enabled him to accumulate an estate, which, at the time of his death, amounted to *Page 267 
about $37,000. This estate consisted of bonds, mortgages and several bank accounts, the largest single item of all of which is represented by the money in the savings account, which constitutes the subject-matter of the present interpleader and controversy.
In support of her claim to the money in this savings account, defendant Lucy Szableski has produced the bank book therefor and the testimony of her son, Stanley, who testified with respect to the statements alleged to have been made by decedent at the time of its delivery to her; she herself having been precluded from testifying with respect thereto by the provisions of our Evidence act. Hence, her entire case rests upon his testimony alone, upon which it must stand or fall.
While the law recognizes and will sustain a gift inter vivos, whenever one is satisfactorily established, nevertheless, public policy requires that the evidence adduced in support thereof should be considered in the light of and tested by those sound safeguards against the perpetration of fraud and perjury which the law has so wisely laid down and prescribed in such cases. All of our cases hold that such a gift can only be established by showing: first, a donative intention on the part of the donor; second, a delivery of the subject-matter of the gift in the manner in which its delivery is most capable; third, that the donor has stripped himself of all ownership and dominion over the subject-matter of the gift. Swayze v. Huntington, 82 N.J. Eq. 127; affirmed, 83 N.J. Eq. 335; Mullen v. Mullins,130 Atl. Rep. 628; affirmed, 98 N.J. Eq. 727; Page v. Afflerbach,102 N.J. Eq. 390; affirmed, 104 N.J. Eq. 489; Reeves v. Reeves,102 N.J. Eq. 436; Kirkpatrick v. Kirkpatrick, 106 N.J. Eq. 391.
The burden of satisfactorily proving the existence of each of these prescribed elements, by evidence that is both clear and convincing, is upon the one who asserts and seeks to establish such a gift. And, with all the more force and reason is this wholesome rule applicable in a case, such as is the one subjudice, where the alleged gift is asserted for the first time only after death has sealed the lips of the alleged *Page 268 
donor. Before a gift, asserted under such circumstances, will be sanctioned and sustained by this court, it should require the production of proof that is both cogent and convincing in quality. Madison Trust Co. v. Allen, 105 N.J. Eq. 230; Wright
v. Sanger, 101 N.J. Eq. 203; Schroeder v. Stoky, 2 N.J. Mis.R. 760. Has then the defendant Lucy Szableski produced such proof?
Her son, Stanley, testified that on the day preceding the testator's death, he, upon arriving from school for lunch, didn't find his mother at home; that he then went up to the testator's apartment, where he saw his mother and a doctor standing in testator's bedroom; that his mother then went downstairs to prepare his lunch, while he remained outside of testator's room and heard the doctor advise testator to go to the hospital; that when his mother returned, he went downstairs, had his lunch and then came up again; that he saw the testator as he was about to start downstairs, hand his mother something and heard him say good-bye to her, to which he added, on cross-examination, that he also heard him tell her, "this is for you, I want you to keep it."
Upon this naked and uncorroborated story of her fourteen-year-old son — who, needless to say, has a most vital interest in the outcome of this suit, one that is almost as deep and personal as that of his mother — and the further fact that testator had occupied the second floor of her building, as a tenant, ever since his arrival in Lyndhurst, defendant Lucy Szableski asks this court to take more than one-third of testator's entire estate and award it to her as a gift intervivos.
As against this boy's testimony, we have that of Dr. Charles D. Cropsey. That he is wholly disinterested cannot be gainsaid. His testimony is to the effect that he made a professional call at the testator's home at about noon of January 15th, 1930; that he immediately removed testator to the hospital, where he passed away early the next morning; that upon his arrival at testator's home, he found him in bed, suffering from Bright's disease, coughing and experiencing *Page 269 
great difficulty in breathing; that testator was dropsical for five years and had neglected himself because he was a penurious man; that he helped testator dress, assisted him from his room down the stairs and into the automobile, and then up to the hospital; that while he was holding testator near the stairway, he saw him shake hands with defendant Lucy Szableski, who was standing there at the time, but stated, however, that he did not see him give or hand her anything.
If it be true that decedent then gave defendant Lucy Szableski the bank book, as testified to by her son, it is strange, indeed, that Dr. Cropsey, who was right there at the time, should have seen him shake hands with her, and yet not have seen him hand her the bank book. It is also strange that the doctor didn't hear decedent then say to said defendant, "this is for you, I want you to keep it," if, in fact, any such thing were said.
Another witness, William Harvey, testified that he, as trust officer of the Rutherford Trust Company, handled the testator's estate; that on the same day that testator died, he went to the testator's home for the purpose of taking possession of testator's papers and property; that he was admitted to the testator's home by defendant's son, Stanley, who accompanied him through the apartment, all the doors to which were unlocked.
Upon being recalled as a witness for defendant, Rutherford Trust Company, Mr. Harvey testified that on the occasion when he was admitted to testator's apartment, he told the boy, Stanley, to ask his mother, who was also then present, if she knew where the bank book in question was, and that she replied that she did not know; that he then asked the boy if he knew where it was, and he, too, said no; that he especially inquired of them to the whereabouts of this bank book, the existence of which he had learned about from complainant's cashier on the morning of testator's death. William Collins, the undertaker, testified that he was present and heard Mr. Harvey ask the boy about the bank book in question, and heard the latter say that he did not know anything about it. *Page 270 
Neither the boy nor his mother deny having made the statements concerning the bank book which Messrs. Harvey and Collins say they did on the morning of testator's death. These statements, needless to say, are irreconcilable with the boy's present story that his mother had the bank book, he having seen her get it from the testator as the latter was leaving for the hospital. Bearing in mind the fact that the boy and his mother had complete access to testator's unlocked apartment, since his departure for the hospital, and also having in mind the testimony of Dr. Cropsey that he didn't see the testator hand said defendant anything — although he was right there — it is not at all impossible or unlikely, to say the least, that she may not have obtained possession of this bank book improperly and in a way other than claimed on the stand by her son.
Moreover, I have been unable to ascertain from the evidence any sound reason, whereby testator would have been prompted to bestow upon his landlord, said defendant, so munificent a gift, representing, as it did, more than one-third of his entire estate. Nor has any satisfactory evidence been produced to warrant a finding on my part that the testator ever harbored or entertained any such intention. On the contrary, the weight of the evidence clearly negatives the existence of any such generous intentions on the part of the testator towards said defendant. Of this, abundant proof may be found in and gathered from the testator's numerous letters to his niece, wherein he complains about the attitude and acts of the said defendant and her family towards him.
In one of these letters he wrote:
"If I have written from time to time that you should come over here, the reason for that was, if anything should happen to me, and as I often have $100 and more with me, the Polish people [referring to defendant, Szableski and her family] would take it away from me at once, although they are Catholic and go to church every day, they steal like rats."
 In another of these letters he wrote: *Page 271 
"I have sometimes already carried on my chest $200 — as at the present time, I have to pay much and to send much. This money would be grabbed by them [referring to the Szableski family] right away, if anything happens to me."
And in still another of these letters he wrote:
"I can inform you that I have made a new will last week, the old one I have destroyed in the presence of my attorney, it cost me $10. I have made it as I said before, you and Ida in equal shares, in case you should die, it will devolve on your children in equal shares. I have renovated my furniture, you should know that I have 6 oak chairs, 3 kitchen chairs, one rocking chair, yes, a whole equipment, the Polacks are naturally behind it, but I can hold my own against them. I do not want to die with them, it is sufficient that my Richard died there, they are a special race, maybe I wrote you already that that girl who was in my room in the night time at my pocket, told me once in the face `you never die,' this shows that the old people have talked about it, they would like to see me fall over [and die] and they could then rob me."
In addition to the foregoing declarations of the testator, there is the testimony of Minnie Fisher, to whom he had complained about "the Szableski's snooping in amongst his possessions." Christine Schultz testified that the testator had complained to her about the Szableski family and had told her that they were always taking things out of his room, raising his rent and trying to get all the money out of him that they could.
Nor should sight be lost of the fact that the testator, less than three months before his decease, had made a will — identical in all respects, excepting as to the personnel of the executor, with the one made by him three years previously — wherein he expressly recognized his sister and niece as the sole and natural objects of his bounty. It does seem strange, indeed, that if the testator were charitably inclined towards said defendant — as she would now have it appear — that he should not have provided for her in either of his wills. To my mind, his action in not even mentioning her name in either of his wills is a strong indicant that he desired and intended that no part of his worldly belongings *Page 272 
should go to her or her family — to whom he always referred as the Polish family who would rob him — but that all of it should go, as therein specified, to his sister and niece, for both of whom he had a strong and natural affection.
These letters written, and wills and statements made, by the testator are, in my judgment, cogent proof tending to show the existence of a state of mind and purpose in the testator wholly inconsistent with the making of the alleged gift to said defendant. As such they constitute proper items, together with all other evidence bearing thereon, for the court to consider in arriving at its determination as to what the testator's intention or state of mind was at the time of his having made the alleged gift inter vivos. Parret v. Craig, 56 N.J. Eq. 280; affirmed,Ibid. 848; Shillman v. Wiegand, 54 N.J. Eq. 198; Whitney v.Wheeler, 116 Mass. 492; 28 C.J. 704 § 138.
After a careful examination and consideration of the evidence, and for the reasons hereinabove discussed, I am unable to say or find that defendant Lucy Szableski has, by satisfactory evidence, established a voluntary delivery or a donative intent on the part of the testator with reference to the fund in question. On the contrary, the evidence fully satisfies me that the testator did not make a gift inter vivos of said fund to the said defendant, and that it, therefore, constitutes a part of his estate, to the possession of which defendant Rutherford Trust Company, as the executor of his estate, is entitled. I will advise a decree in accordance with these views. *Page 273