John French Grimes, a bombardier with the American Eighth Air Force in the recent World War, was shot down and killed on a mission over Germany. He is survived by two brothers and two sisters, all of the half blood. One of the brothers was appointed administrator and is the complainant herein; the defendant is a sister with whom the decedent lived when he enlisted.
The complainant charges in his bill that the defendant accepted for safekeeping from her brother John an old fashioned ladies watch, a pair of diamond earrings, two unset cameos and a number of old coins, and that she subsequently received money from John and money from the United States Government for John, some or all of which she retains in an account at the National Bank of Clementon, opened in their two names.
There is no dispute with respect to the keepsake jewelry and the old coins. The defendant frankly admits that when her brother enlisted he gave them to her to keep for him. At that time she was unmarried (having been divorced); her mother had recently died of a heart impairment and she suffered from a like disorder; to make certain that the trust *Page 559 
she had assumed would be faithfully discharged, she rented a safe deposit box at the Clementon bank in her name and that of her brother, placed his jewelry and coins therein, and mailed him a signature card. The jewelry and coins were in the box at the time of final hearing and the defendant expressed her complete willingness to deliver them to the complainant, asking only that delivery be made in the presence of a witness. If these articles have not already been delivered to the administrator, their delivery will be decreed.
At final hearing it was established that, after his enlistment, John caused $1,276.97 to be transmitted to the defendant. Of this sum, $156.97 was paid to her in cash, October 8th, 1942, by the Clementon bank; it had, that day, received a check from the Chase National Bank with instructions to pay it to her. The balance, $1,120, she received from the United States Government in fourteen monthly allotment checks of $80 each. The defendant claims all these moneys as gifts from John.
Where the only claim to ownership and the only justification for possession of personal property, admittedly received from another, is that of a gift inter vivos, the burden of proof rests upon the claimant and can only be satisfied by evidence of such probative force as to clearly establish every element of a valid gift. Wright v. Sanger, 101 N.J. Eq. 203, 211;137 Atl. Rep. 657.
The requisites to establish a gift inter vivos are (1) a donative intent on the part of the donor; (2) an actual delivery of the subject-matter of the gift, at least to the extent practicable or possible considering the nature of the thing given; and (3) a stripping of the donor of all ownership and dominion over the subject-matter of the gift, at least to the extent practicable or possible considering the nature of the thing given. Swayze v. Huntington, 82 N.J. Eq. 127, 133;87 Atl. Rep. 106; affirmed, 83 N.J. Eq. 335; 91 Atl. Rep. 1071;Johnson v. Savings Investment, c., Co., 107 N.J. Eq. 547;153 Atl. Rep. 382; affirmed, 110 N.J. Eq. 466; 160 Atl. Rep. 371.
This court will not sanction and sustain a gift inter vivos, asserted for the first time after the death of the alleged donor, *Page 560 
unless evidence is produced that is both cogent and convincing.First National, c., of Lyndhurst v. Rutherford Trust Co.
(Court of Chancery), 109 N.J. Eq. 265, 267;157 Atl. Rep. 142.
There has been no certain proof that the remittance of $156.97 originated with John French Grimes. However, the defendant concedes that this money was forwarded by her brother John who was then in England. The defendant did not carry the burden of proof which this concession placed upon her. I have said that, when John enlisted, the defendant agreed "to keep for him" the jewelry and old coins and that she placed them in the safe deposit box in their two names and sent John a signature card; he signed the card and returned it. Then came the remittance of $156.97. Thus, it might as reasonably be inferred that John, in sending this money to his sister, assumed that she would receive it to be held safely for him as that he was making her a gift of the money. She testified that she had made no arrangement whatever with her brother about money, and that she had received no instructions from him with respect to this particular fund. Under these circumstances, I must find that no donative intent has been established, and advise that the defendant pay to the complainant $156.97 plus interest from the day the money was deposited in the Clementon bank, at the rate allowed by the bank on that account.
With respect to the money represented by the allotment checks, the situation is entirely different. While it is true that the defendant testified that she had no arrangement with her brother John concerning these checks, evidence of a donative intent was supplied by the complainant. This consisted of a photostatic copy of the government form executed by John authorizing a deduction of $80 per month from his pay and directing that it be paid to the defendant. John had reached his majority in August, 1942; the authorization was dated September 29th, 1942. The form contained a printed representation on his part that the sole purpose of the allotment was for the support of defendant as a relative. It recited that it was to run for an "indefinite" period of time. I cannot avoid the conviction that this authorization by John *Page 561 
was an affirmative and positive declaration of his intent to donate $80 per month to his sister, the defendant.
The fact that the defendant attempted to open a bank account in her name and that of her brother John, and that she deposited most of the money she received from John in that account, is not significant under the proven circumstances of this case. The defendant denied that she had any intention of creating a trust when she chose to open the account in the two names; she declared that she intended only to make certain that John would receive any balance remaining in the account in the event of her death. Furthermore, the defendant treated the fund in the account as her own. A trust cannot be spelled out of these facts. PassaicNational Bank v. Taub (Court of Errors and Appeals), January 31st, 1946, 69 N.J.L.J. No. 8, p. 2.
It was natural that John should wish to make some financial provision for his sister, the defendant, when he was in a position to do so. John lived with his mother until she died. After the death of John's father his mother remarried; her third husband was a waiter and his financial affairs did not prosper; John's mother lost the home that she owned or was buying in Clementon and they were forced to rent; for a year or more before her death John's mother suffered from the heart ailment; John ceased attending school to care for her; the defendant, who was living and working in Camden, paid both her mother's and John's doctor bills and gave her mother $5 each week. John knew that the defendant was taking medicine for a heart condition.
Two months after the death of John's mother, John's stepfather left the home. John was befriended by the witness, Mrs. Curran, until his sister, the defendant, could arrange her affairs and move to the Clementon home to care for him. The defendant supported John in that home until he enlisted. After his enlistment and until he was sent overseas, John visited the defendant whenever he was given a furlough.
It is obvious that John wished to favor those who had respected his mother and been friendly with him. His eldest brother, the complainant, had attended his mother's funeral and, prior to her death, had occasionally visited her home; *Page 562 
John made this brother the beneficiary of $4,000 in government insurance on his life. John made no allotment to or insurance provision for his other sister; this is understandable; she admitted at final hearing that she had not visited or contacted her mother over a very considerable period of time prior to her mother's death. To his sister, the defendant, who had taken care of him after his mother's death, he not only made the allotment of $80 per month, but he designated her as the beneficiary of insurance upon his life in the amount of $6,000. When John was reported missing in action the government notified the defendant as his named next of kin; when John was declared dead, she was notified and John's clothing and personal effects were forwarded to her; and to her as his named next of kin, the government made gratuity payments for six months.
Complainant, on argument, made much of the testimony of Betty Whitmore. She is the sister who apparently became estranged from her mother long before her mother's death. I should not and I have not considered her testimony as having much weight. She was offered as a witness two months after the testimony of the other witnesses had been heard. When final hearing had been virtually concluded, counsel for the complainant sought and was granted an opportunity to secure and to introduce in evidence a photostatic copy of the allotment form signed by the decedent, or to produce evidence of its contents. On the adjourned day, Mrs. Whitmore was called as a witness for the complainant. She was not questioned with respect to the allotment but as to facts and circumstances which had been developed at the original hearing. Upon interrogation by the court, she admitted that she had talked with the complainant long before final hearing about the matters concerning which she testified. She also stated that she had not been contacted by or for the complainant with respect to this case until after her sister, the defendant, had testified and her case had been fully disclosed. Our Court of Errors and Appeals recently said that as a general rule additional testimony should not be taken in this court after the conclusion of a case "because it opens up an opportunity for the `deliberate coloring or manufacture of testimony to *Page 563 
suit some specific need which may be apparent only after the opposing counsel's argument has revealed where the emphasis of his claim is placed and what conclusion he founds upon the evidence as already presented.'" In re Post, 134 N.J. Eq. 502;36 Atl. Rep. 2d 299.
The complainant, who waited until he had heard the testimony of the defendant before he asked Mrs. Whitmore, his sister, to be a witness, and Mrs. Whitmore, are financially interested in the outcome of this case. As I carefully observed her on the stand, I was persuaded that her interest in the outcome of the case, or some ill feeling for her sister, the defendant, was coloring her testimony.
A decree will be advised in accordance with these conclusions. *Page 564