## 9524

### SHARPE v. SHARPE.

#### (90 S. E. 34.)

1. Gifts—"Gift Causa Mortis"—Elements.—The factors of a gift
   *causa mortis* are a donor of sound mind, having the intent to give,
   making a gift in view of his impending death, dying of the disorder
   then upon him, and delivery of the gift, without fraud anywhere in
   the transaction.
2. Signatures—When Complete.—Where a person, in the presence of
   and at the direction of a party signs such party's name, while he
   touches the pen in making a cross, the signature is complete, although
   others present do not sign as witnesses, and although the words "his
   mark" were not affixed until after death of the signer, the signature
   being provable by parol, since authority to make it is conferable
   orally.
3. Gifts—Character—Elements.—A gift *inter vivos* does not differ
   essentially from a gift *causa mortis,* except that the latter may be
   defeated by the donor's survival; two things, intent and delivery,
   being essential to all gifts.
4. Gifts — Delivery to Agent — Effect. — Delivery of a gift to the
   donor's agent for delivery to the donee is not sufficient delivery.
5. Gifts—Delivery to Agent—Effect.—Where the donor placed a
   check in the hands of a relative of the donee to give to her, the
   delivery was sufficient to support the intended gift *causa mortis,*
   under the presumption that such party was the donee's agent.

Before Prince, J., Orangeburg, October, 1915. Modified.

Action by Ellen D. Sharpe, individually and as administratrix of the estate of Jefferson D. Sharpe, deceased, against J. Benjamin Sharpe. Judgment for defendant, and plaintiff appeals.

The following is the testimony in the record referred to in the opinion, showing the circumstances and what was said and done in reference to the attempted gift of the $1,500:

Footnote.—Gift of check as valid gift *causa mortis,* see 10 A. & E. Ann. Cas. 475. Delivery to third person, see 2 A. & E. Ann. Cas. 1003, 1 L. R. A. 536. Generally as to gifts *causa mortis,* see notes in A. & E. Ann. Cas. 1912c, 272, 11 L. R. A. 684, 6 L. R. A. 367.

Q. Did he say anything about some money he had in bank? A. Yes, sir. Q. What did Mr. Sharpe say to you, if anything, in relation to the money in bank? A. He told me he had $1,500 in the bank in Swansea, and if there was not something done about it, his widow would be left with nothing to go upon, and that he wanted me to go to Swansea and draw that money out, bring it to my home and take care of it, until I seen what became of him, whether he would live or die. If he lived, why I could turn it over to him, and if he died, why I was to let the widow have it, turn it over to her or take care of it; so he called her and told her to get the bank book, and give it to me, and I told him I could not get money out of the bank that way, unless I had a check. He asked me if I had any blank checks, saying that he had none. I told him: "Yes; I had a check book in my pocket." He told me to write out a check for it, and I did so. I handed it to him to sign; I helped him up in bed and steadied him for to sign it, and he told me he felt so weak that he did not feel able to write his name; that he would just make his mark, which he done. Q. Who does it belong to? A. Well, it belongs to the widow, I suppose. Q. Tell us that conversation now. A. He told me that he had $1,500 in the Bank of Swansea and he wanted it to go to his wife, and he wanted me to go up there and get the money out of the bank that day, or as soon as I conveniently could, bring it home, keep it until he seen whether he lived or died; if he lived turn it over to him, and if he died, to give it to his widow, that if he didn't make some provision for her, that she would be left without it and no one to see after her; and I said: "Well, I would do the best I could for him." Q. Did you have any more conversations with him, Mr. Justus, in reference to this matter until he died? A. Yes, sir. Several times he talked to me about it. He tells me that he wanted me to attend to it, and he didn't think he would be able to get up. He wanted me to see that his wife got the money. Q. Who did he give you the check or the money for? A.

For his wife.   Q. What was it that he told you that he wanted done with that check?   A. He wanted me to bring it home and keep it, and if he lived turn it over to him, and if he died, to give it to his widow.   Q. You were not his agent?   A. No, sir.   Q. He didn't make you his trustee? A. No, sir.

The foregoing is the testimony of the witness, C. C. Justus, who was the brother-in-law of the intestate.

It appears in the record that Justus took the check in question to the Bank of Swansea the next day and the check was marked paid by the cashier, and the amount placed to the account of the said C. C. Justus in the bank.   Jefferson Sharpe died about a week afterwards, and Justus gave the plaintiff a check for this money, but the bank, on objection of the defendant, refused to pay the same.

Testimony of Watson Justus (son of C. C. Justus) :

Q. What did Mr. Jefferson Sharpe say he wanted done with the money?   A. He said for Mr. Justus to get it, and if Mr. Sharpe got well, to turn it back to him, and if he didn't, to give it to his widow, Mrs. Ellen Sharpe.   Q. What did your father say to him?   A. He told him all right, that he would.   Q. After your father came there, did you hear any conversation in reference to any money in the Bank of Swansea?   A. Yes, sir; Mr. Jefferson Sharpe told Mr. Columbus Justus that Mr. Sharpe had $1,500 in the Bank of Swansea, and he told him that I want you to get it out, I don't know whether I am going to live or not, and he said if I don't live, you give it to my wife, and he said, if I do live you can give it back to me.   Mr. Justus told him all right, that he would do the very best for him that he could.

Rev. T. L. Belvin testified :

Q. Did he mention anything about his property to you? A. Yes, sir; he told me to help him, and after talking about some matters concerning his spiritual interests he then referred to some business matters.   Q. What did he say in respect to the business matters?   A. He said : "I am troubled

about my little business;" he says: "I have fixed the money part, I had some money in the Bank of Swansea. I gave a check for that to my wife; but this property, this house and lot, is not fixed like I want it." Q. Is that all he said? A. Yes, sir. That is I believe absolutely all.

Mr. Webster King testified:

Q. During the night when you were there, did he talk with you? A. Yes, sir; but he said nothing about his business affairs. Later during the night, Mr. C. C. Justus told Mr. Jefferson Sharpe in the presence of myself and Mr. Hooker that he had taken the check down to the bank, and that they didn't have the money, but just transferred it to his account, meaning Justus, and that he (Justus) understood that Ben Sharpe was complaining about it; then Mr. Jefferson Sharpe said, well, that is all right, it is a poor chance if a man cannot do what he wants to with what is his own, that Ben was always too fast anyhow.

Mr. James Hooker testified:

Q. Do you recall any conversation being had in reference to Mr. Sharpe's property matters during the night? A. Yes, sir. Q. Please tell us what was said or done. A. Mr. Justus said to Mr. Jefferson Sharpe, that he had attended to that matter, that he had told him that they didn't have the money to cash the check at Swansea, and he placed it to his credit at Swansea, and he said it was all right. He said that he understood that Mr. Ben Sharpe was cutting up about it and he said that it was all right, that he had got all he aimed for him to have, that he was always too fast anyhow.

*Messrs. Wolfe & Berry,* for plaintiff-appellant, cite: *As to gifts causa mortis:* Story Eq. Juris., secs. 606 and 607; Prec. in Chan. 300; 1 P. Wms. 404 and 552; 3 Atk. 214; 2 Ves. 431; Str. 955; 1 Wms. Exors. 649. *Check subject of gift:* 14 A. & E. Enc. L. (2d ed.) 1063; 2 Kent. Com., sec. 447; 12 S. C. 460. *Delivery:* 20 Cyc. 1232, 1235; 14 A. &

E. Enc. L. 1060 and 1061; 24 N. E. 248; 2 Schouler Per. Prop., sec. 176; 49 N. Y. 17; 3 Strob. 199; 6 L. R. A. 367; 28 S. C. 277; Rich. Eq. Cas. 26. *Signature of another:* 25 A. & E. Enc. L. (2d ed.) 1066.

*Mr. Barrett Jones,* for defendant-appellant, cites: 28 S. C. 276; Rich. Eq. Cas. 26; 14 A. & E. Enc. of L. 1054. *Agency:* 2 Kent. Com. 784; Ewell's Evan's Agency 1; 14 A. & E. Enc..L. 1025, 1026, 1011, 1012. *When gift is complete:* 31 Ohio St. 457; 30 Hun. 634, 635; 13 Mich. 282.

*Mr. Wm. L. Glaze,* also for defendant, cites: *As to proof required:* Parson's Contracts (6th ed.), sec. 2237; 28 S. C. 277, 278; 20 Cyc. 1233 and 1246; Rice L. 313; 98 N. Y. S. 725. *Delivery:* 3 Pom. Eq. Juris. 1149; Dudley's Eq. 14; 74 Mo. 195; 41 Am. Rep. 312; 8 A. & E. Enc. L. 1350; 107 U. S. 602.

September 30, 1916.

The opinion of the Court was delivered by MR. JUSTICE GAGE.

The plaintiff is widow of Jefferson Sharpe, and the defendant is his son by a former marriage. These two are at outs about $1,500 in money which had belonged to Jefferson, and which he had in a bank. The plaintiff, in an action to marshal the assets of Jefferson's estate, made claim for that $1,500, which she alleged her husband had given her on the eve of his death, *donatio causa mortis..* The defendant disputes the gift. The master sustained the gift; the Circuit Court concluded against the gift. And that is the issue.

There is no difference about the words used when the transaction was had. There is no difference about what in

law constitutes a gift by reason of death. The only differ-
ence is the application of the law to the admitted
transaction. · If an intent may be proven beyond a
reasonable doubt, the testimony here proves that the
deceased intended for his wife to have this money after his
death in the event of his death; all the testimony is that way,
there is none *contra.* If that intention, as expressed, was in
truth performed by the deceased, then the gift ought to be
sustained. The Court found that the transaction was had
while the deceased was of sound mind, and that it was free
from fraud, and to that there is no exception. The Court
also found that the transaction was had in view of the
impending death of the deceased, and that the deceased died
of the disorder which was then upon him; and to this there
is no exception.

The only other factor going to constitute a *donatio causa
mortis* is a delivery of the thing. All the real argument
centers about that; the plaintiff's eleven exceptions and the
defendant's one exception all go in the main to that issue.

The defendant, by proper exception, insists that Jeffer-
son did not even sign the check, and there was, there-
fore, no first step taken towards the execution of his
intent. The Court did not decide that issue, and it
is renewed here.

It is true that Jefferson's hand did not direct the pen which
marked his name. The hand of Watson Justus did that.
But Jefferson was present and directed the act to be done and
touched the pen which made the X.

It is true that the words "his mark" were not written until
Jefferson was dead; and neither were the names of the two
witnesses to the check written on the check until Jefferson
was dead; but they were present and saw Jefferson give the
direction and touch the pen. The bank took no exception
to the manner in which the check was executed, for it paid
it, so marked it, and the amount of it was put to the credit
of the payee, C. C. Justus. It is true that the bank's action

is not conclusive against the defendant.

But when Watson Justus signed the name of Jefferson, in the presence of Jefferson, and by his direction, that was a signing by Jefferson whether those who saw the transaction signed as witnesses or not. The authority of Watson to write Jefferson's name was conferable by parol; and the proof of the power and the execution of it rests upon the words of those who stood by and saw the transaction, whether they were denominated as witnesses on the check or not. See Story on Agency, c. 5; 2 Corpus Juris., pp. 449-451.

The testimony is clear that Jefferson authorized Watson to sign his name; there is none *contra*. The Circuit Court concluded from the testimony that C. C. Justus, the payee of the check and he who collected the money on it, was the agent of Jefferson; or at most was the agent of both Jefferson and Ellen. And the Court concluded that a man can not deliver to himself; and for that reason alone the Court decreed against the gift. Let the three and a half pages of testimony quoted in the Circuit opinion be reported.

A gift *inter vivos* does not differ, in its essential elements, from a gift *causa mortis,* except that in the latter the survival of the donor may defeat the gift. *Hall v. Howard,* 24 S. C. L. (Rice) 314, 33 Am. Dec. 115.

In every gift, like in well-nigh every human act, there exists two elements. One of these involves the intent of the donor's mind; the other of these involves the act of the donor's hand. If a donor intends to confer on another ownership of his property, and if he proceeds so far as to do it, then the gift is complete.

The particular transaction in the facts of it may be muddled by the character of the thing given, to wit, a check on a bank, or by the agency through which the act is done, to wit, through the hands of another than the donee.

In the instant case, as we have held, the check was right-fully signed by Jefferson. The payee, Justus, drew the money from the bank and redeposited it in his own name. It is the same, then, as if Jefferson had put $1,500 into Justus' hands, with the direction to him about which there is really no dispute. Nor can there be any question but that Jefferson intended to give to Ellen; all the testimony is that way.

The only issue of fact, and of law is, did he sufficiently do it? Jefferson, if alive, could not be interested in that question, for had he put the money into Ellen's hands under the admitted direction, yet upon recovery it must have come back to him. Jefferson's heirs alone are interested in whether Jefferson went so far as to do what he intended to do. Under our cases, it is true, Jefferson must have done that which he intended to do. If he did not do that, that is, put the money into Ellen's hands, but instead put it into the hands of his agent to do that for him, then his act stopped short of a gift, for it stopped short of a completed act. Plainly the putting of the money into Justus' hands was a putting it into Ellen's hands, if Justus represented Ellen. About that there will be no denial.

The Court thought that the testimony made Justus the agent of Jefferson, or at least, the agent of both Jefferson and Ellen, and that, therefore, there was no delivery to Ellen. That is the narrow issue upon which the cause was decided, and we venture to think wrongly decided. In well-nigh every transaction of this sort where the donor acts in delivery through the agency of another, that other is in some sort his agent.

The action must be through another unless it be directly with the donee, because the donor acts in view of certain death. It is not likely to be exclusively with the donee, because his ownership is defeasible. And if the transaction be between the donor and the donee in their own persons, even in that case the donee is in some sense the agent of the

donor to return the article to the donor in the event he shall survive. But that circumstance would not rob the delivery of its effectiveness. The emergencies of every such case press hard; a dying man, with mind freighted with memories of the past and apprehensions of the future; his friends gathered about the scene; no expert to advise what ought to be done to accomplish his intentions. Such a situation calls generally for the intervention of a third party, to hold the stake until the event be determined. We think too much nicety may be exercised in determining who the third man exactly represents. If it be possible to do so, the law ought to be construed not too logically, but to meet the common transactions of our people in their homes. In the instant case the third person was the friend and kinsman of Ellen, his trust was to deliver to her, if the contemplated event shall happen, as it did.

It is true that had the donor recovered, it would have been the duty of the third person to return the money to the donor; but as before suggested that is not decisive of the question, for had the transaction been betwixt the donor and donee, without the intervention of a third person, the same duty under the same circumstances would have rested on the donee. Enough was done to accomplish that which the donor intended; there was a sufficient delivery.

The cases on the subject are not in harmony, of course. Our own case of *Gilmore* v. *Whitesides,* 13 S. C. Eq. (Dud. Eq.) 23, 31 Am. Dec. 563, was based largely on what the third person said; he said he acted for the donor. And that case involved the force and effect of a written instrument which was plainly not a gift *causa mortis.*

One case from Minnesota is on all fours with that at bar; and there the gift was sustained. *Varley* v. *Sims,* 100 Minn. 331, 111 N. W. 269, 8 L. R. A. (N. S.) 828, 117 Am. St. Rep. 694, 10 Ann. Cas. 473. And there are others of like import. The Courts put the case upon a presumption of fact, that it will be presumed, nothing else appearing, that

the third party acts for the donee.   12 R. C. L. 960.   The
respondent insists that gifts of this character ought to be
looked in the mouth; that the Courts ought to be jealously
distrustful of them.   Judge Butler said as much in *Hall* v.
*Howard, supra;* but other Judges have not expressed that
view.   *Trenholm* v. *Morgan,* 28 S. C. 278, 5 S. E. 721.
Gifts *causa mortis* are older than the republic; and if they be
satisfactorily proven, it is the duty of the Court to give effect .
to them.

We have not considered the suggestion of the respondent
that the transaction was of a suspicious character; the decree
below settled that issue, and there is no appeal from it.

Our opinion is that the judgment below be modified, and
the cause remanded to the Circuit Court to carry our views
herein expressed.