The following "facts" are set up in the brief of the defendant's counsel, who insists they have all been admitted or proved:
Maria E. Tunis, now deceased, had on deposit with the Madison Trust Company, on April 13th, 1928, the sum of $8,291.60 as shown by bank book No. 201. This sum was deposited in the special department of the bank. Upon bill of interpleader by the bank, the sum of $8,291.60 was directed paid to the clerk of this court.
The moneys are claimed by Russell E. Young, substituted administrator of Maria E. Tunis, and by J. Frank Allen, *Page 231 
who claims a gift of the book inter vivos during the life of the deceased.
Miss Tunis was eighty-four years of age, unmarried and had boarded with J. Frank Allen in Madison for the last year of her life. She was a cousin to Mr. Allen's mother, and was known by Mrs. Allen for thirty-five years.
The Allen family consisted of the husband and wife. Miss Tunis paid them $5 a week for her board. Her nearest relatives were nephews and nieces.
She appears to have enjoyed unusual good health for a woman of her age, both mental and physical.
Her securities were kept in a lock box which she deposited in the safe in the store of Mr. Allen. This box was always kept locked. Miss Tunis retained the keys.
The store of Mr. Allen was a part of the house occupied as their home.
On the 27th day of April Mr. and Mrs. Allen and Miss Tunis were sitting at the table in the evening reading, when Miss Tunis looked up at the calendar and, addressing Mr. Allen, said: "It is near the first of the month. I have some coupons that are due the first of the month and I would like when you go down to the bank; if you will get my box I will get the key." Miss Tunis then went upstairs, got her key and Mr. Allen got her box for her. This box was in the safe in Mr. Allen's store.
When Miss Tunis returned with the keys and Mr. Allen returned with the box, Miss Tunis unlocked the box and took out one bank book. She looked at that, then she took out another bank book and looked at that, then she took out a little piece of paper and crumpled that up in her hand. She then took out the last bank book and then picked up the first bank book and handing it to Mr. Allen said: "Here, Frank, you take this for what you have done for me. You have done more for me than any of my nephews and nieces, and I want you to have this." At the time she said this to Mr. Allen, she handed him the book and he took it and thanked her. She then looked at her bonds, put them back *Page 232 
in the box, closed and locked it and returned the box to Mr. Allen. Miss Tunis retained the keys.
Mr. Allen put the bank book in his pocket.
At this time Miss Tunis told Mr. Allen she wanted to make a will. She did not want her money to go the way her sister's did and said: "I want to make a will and I want it to go to those who need it," and asked Mr. Allen how she would go about it to make a will, and he advised her that she ought to have a lawyer. Miss Tunis then requested Mr. Allen to get a lawyer and to have him come to the house.
The following morning Mr. Allen went over to the bank and presented the book to Mr. Miller for the purpose of having the funds transferred to his own name. Mr. Miller gave him a couple of yellow slips to take up and have Miss Tunis sign. Mr. Miller returned the book to Mr. Allen and he returned home with the book and slips which Mr. Miller told Mr. Allen to fill out and have Miss Tunis sign. When Mr. Allen returned about eleven o'clock, there were guests at the home and Miss Tunis was with them in the kitchen. While at the bank, Mr. Miller, at the request of Mr. Allen, called up Mr. Pilch, an attorney residing in Madison, and who was likewise the attorney for the bank, and informed him of the desire of Miss Tunis to make a will.
Mr. Pilch came to the store before three o'clock Saturday afternoon.
Mrs. Spargo was at Mr. Allen's for lunch and after lunch Miss Tunis remained in the kitchen talking to her until Mrs. Spargo left about ten minutes of three. Then Miss Tunis went upstairs. After Miss Tunis went upstairs, Mr. Pilch came. Mr. Allen told Mr. Pilch that Miss Tunis had just gone upstairs to dress and that he would have to wait a few minutes. During this time Mr. Pilch remained in the store.
At the end of the fifteen minutes Mr. Allen went in the hall and called to Miss Tunis. Receiving no response, Mr. Allen went up the stairs to the front room where Miss Tunis usually sat in the afternoon. She was not there, and then he went to her room. She was dead. *Page 233 
If these statements had been admitted or proved, there can be no doubt that the property in question, that is, the $8,291.60, belongs to Mr. Allen. That there may be a gift inter vivos of a bank book, such as the one in question, is too well settled to make it necessary to cite authorities. The substituted administrator of Miss Tunis' estate, however, denies that there was in fact any such gift. He contends that the court should take into consideration the surrounding circumstances and the conduct of the alleged beneficiary at the time and immediately thereafter. In matters of this kind the court, I think, would be thoroughly satisfied that the gift was actually made before depriving the rightful next of kin of his patrimony. Both counsel agree that the case is purely one of fact. I think, however, that defendant's contention that I am limited to the sole question of whether or not the testimony of the one witness produced is on its face true, is too narrow. In order to determine her reliability, I must, as I see it, take into consideration surrounding circumstances, personal interest and the actions of the claimant at or immediately subsequent to the alleged gift. This I shall do, especially as there was no objection to its reception at the hearing.
Miss Tunis was of an extremely penurious disposition. The only gift she ever made to the Allens was $5 each on Christmas day. She hoarded her money, fearing that in her old age she might be in want. The alleged gift represents one-third of her estate. She was in good health at the time she is alleged to have made it. She was not unfriendly to her nieces and nephews, the natural objects of her bounty. Her only complaint was that they did not come to see her often enough. Even this is explained by the fact that she grew forgetful and often after their visits failed to recollect they had ever been made. The sole purpose of opening the strong box on April 27th, according to defendant's one witness, was to cut coupons from bonds. This was not done and no explanation is given as to why the coupons were not removed.
The next morning Mr. Allen went to the bank and endeavored *Page 234 
to persuade the officials to transfer the account to him. They refused to do so because the account was in Miss Tunis' name. They, however, gave him withdrawal slips for her to sign, which he took home. He was talking with Miss Tunis for over three hours before her death and she was in perfectly good health. In spite of his hurry to get to the bank, he says he was in no hurry to ask her to sign the slips. His reason is that there was company at the house. The company consisted of his brother and niece and two friends, to whom one would naturally suppose he would have confided the receipt of so substantial a gift. He did not tell them, and he says he did not ask Miss Tunis to sign. It is significant that the slips were not signed. Any normal person who had been freely given such a gift would certainly, I think, have not hesitated to ask the donor to complete it. Although he was in no hurry to ask Miss Tunis to sign, again on Sunday, the day after her death, he persuaded a bank official to go to the home of Mr. Pilch, attorney for the bank, in an effort to persuade counsel to advise turning over the money without the signature. He again went to Mr. Pilch in another attempt along the same lines, and went so far as to tell the bank's counsel, "Well, there will be no trouble, everybody is satisfied I know." While making this statement, he knew, as appears in the testimony, that the next of kin knew nothing about the bank book or the alleged gift. He was appointed administrator of the estate. He thereby made himself, as it were, a trustee for the next of kin, and though acting for them in a fiduciary capacity, did not disclose the alleged gift or the bank book. Moreover, without notice to any of the interested parties, he brought suit against the Madison Trust Company individually for the money. This resulted in his retirement as administrator of the estate.
To my mind, such a course of conduct is not that of a man who is sure he is the recipient of a voluntary gift. It is rather that of one, who, by silence, false statement to bank's counsel, and subterfuge, seeks to possess himself of something to which he is not entitled. *Page 235 
The only witnesses to the alleged act of giving were Mr. and Mrs. Allen. He, of course, was excluded from the witness stand under the Evidence act. Mrs. Allen could and did testify, and though technically entitled to do so, her interest in the case is as deep and personal as that of her husband. Her story is not convincing. She does not say why Miss Tunis abandoned her purpose of cutting coupons in order to give away one-third of her estate when she had announced her intention of making a will the following day and could have made the gift testamentary. Miss Tunis was in good health and no one anticipated her sudden demise.
The only other evidence on which I need comment is that of Miss Duryea, called for defendant. Her testimony was shifty and contradictory in itself. She contradicted Mr. Pilch, a lawyer of high standing, whose evidence I believe to be absolutely true. She even contradicted Mr. Allen himself, in whose behalf she was called. In short, her eagerness to establish her case was so apparent that I do not believe any of her testimony. It tends to convince me that the alleged gift was never made. It is hardly necessary to add that the burden of proof is upon the alleged donee to clearly prove both delivery and donative intent.
Under the circumstances I have above set forth, I cannot believe that a penurious old woman, in continual fear of poverty, would, while in good health, part with one-third of her property. She intended to dispose of it by will the next day, which makes the gift inter vivos more improbable. Coupling this with the deep personal interest of the only witness to the alleged transaction and the conduct of the alleged donee, I shall find as a fact that there was no gift inter vivos, that is, neither voluntary delivery nor donative intent.
I will advise a decree accordingly. *Page 236