JULIA E. FOSTER AND MARGARET WALDNER, EXECU-
TRICES OF THE ESTATE OF ETHEL REISS, DECEASED,
AND JULIA E. FOSTER AND LESLIE FOSTER, TRUS-
TEES FOR ETHEL REISS, DECEASED, PLAINTIFFS-
APPELLANTS, v. ADAM REISS, DEFENDANT-RESPOND-
ENT.

Argued January 17, 1955—Decided March 7, 1955.

*Mr. Ishmael Sklarew* argued the cause for the appellants.

*Mr. John T. Keefe* argued the cause for the respondent (*Mr. William F. McCloskey,* attorney).

The opinion of the court was delivered by

VANDERBILT, C. J. On April 30, 1951 the decedent, Ethel Reiss, entered a hospital in New Brunswick where she was to undergo major surgery. Just prior to going to the operating room on May 4, 1951, she wrote the following note in her native Hungarian language to her husband, the defendant herein:

"My Dearest Papa:

In the kitchen, in the bottom of the cabinet, where the blue frying pan is, under the wine bottle, there is one hundred dollars. Along side the bed in my bedroom, in the rear drawer of the small table in the corner of the drawer, where my stockings are, you will find about seventy-five dollars. In my purse there is six dollars, where the coats are. Where the coats are, in a round tin box, on the floor, where the shoes are, there is two hundred dollars. This is Dianna's. Please put in it the bank for her. This is for her schooling.

The Building Loan book is yours, and the Bank book, and also the money that is here. In the red book is my son's and sister's and my brothers address. In the letter box is also my bank book.

Give Margaret my sewing machine and anything else she may want; she deserves it as she was good to me.

God be with you. God shall watch your steps. Please look out for yourself that you do not go on a bad road. I cannot stay with you. My will is in the office of the former Lawyer Anekstein, and his successor has it. There you will find out everything.

Your Kissing, loving wife,

Ethel Reiss 1951 - 5 - 4."

She placed the note in the drawer of a table beside her bed, at the same time asking Mrs. Agnes Tekowitz, an old friend who was also confined in the hospital, to tell her husband or daughter about it—"In case my daughter come in or my husband come in, tell them they got a note over there and take the note." That afternoon, while the wife was in the operating room unconscious under the effects of ether, the defendant came to the hospital and was told about the note by the friend. He took the note from the drawer, went home, found the cash, the savings account passbook, and the building and loan book mentioned in the note, and has retained possession of them since that time.

The wife was admittedly in a coma for three days after the operation and the testimony is in dispute as to whether or not she recovered consciousness at all before her death on the ninth day. Her daughter, her son-in-law, Mrs. Waldner, an old friend and one of her executrices who visited her every day, and Mrs. Tekowitz, who was in the ward with her, said that they could not understand her and she could not understand them. The defendant, on the other hand, testified that while she was "awful poor from ether" after the operation, "the fourth, fifth and sixth days I thought she was going to get healthy again and come home. She talked just as good as I with you." The trial judge who saw the witnesses and heard the testimony found that

"After the operation and until the date of her death on May 13, 1951 she was in a coma most of the time; was unable to recognize members of her family; and unable to carry on intelligent conversation. * * * Mrs. Reiss was never able to talk or converse after coming out of the operation until her death."

The decedent's will gave $1 to the defendant and the residue of her estate to her children and grandchildren. The decedent's personal representatives and her trustees under a separation agreement with the defendant, brought this action to recover the cash, the passbook, and the building and loan book from the defendant, who in turn claimed ownership of them based on an alleged gift *causa mortis* from his wife.

The trial court granted judgment for the plaintiffs, concluding that there had been no such gift. The Appellate Division of the Superior Court reversed, 31 *N. J. Super.* 496, and we granted the plaintiff's petition for certification to the Appellate Division, 16 *N. J.* 221.

The doctrine of *donatio causa mortis* was borrowed by the Roman law from the Greeks, 2 *Bl. Com.* 514, and ultimately became a part of English and then American common law, *Keepers v. Fidelity Title and Deposit Co.*, 56 *N. J. L.* 302, 305 (*E. & A.* 1893), *Ward v. Turner*, 2 *Ves. Sr.* 431, 28 *E. R.* 275, 278 (1752), *Trout v. Farmers Trust Co. of Newark*, 19 *Del. Ch.* 437, 168 *A.* 208, 210 (*Sup. Ct.* 1933), *Flint v. Varney*, 220 *Iowa* 1241, 264 *N. W.* 277, 279 (*Sup. Ct.* 1935), 4 *Page on Wills* (1941 *ed.*) § 1658. Blackstone has said that there is a gift *causa mortis* "when a person in his last sickness, apprehending his dissolution near, delivers or causes to be delivered to another the possession of any personal goods, to keep in case of his decease." 2 *Bl. Com.* 514. Justinian offered this definition:

"A gift *causa mortis* is one made in expectation of death; when a person gives upon condition that, if any fatality happen to him, the receiver shall keep the article, but that if the donor should survive, or if he should change his mind, or if the donee should die first, then the donor shall have it back again. These gifts *causa mortis* are in all respects put upon the same footing as legacies. * * * To put it briefly, a gift *causa mortis* is when a person wishes that he himself should have the gift in preference to the donee, but that the donee should have it in preference to the heir." *Walker's Just.*, at 119.

The modern description is similar:

"A *donatio causa mortis* is a gift of personal property made by a party in expectation of death, then imminent, and upon the essential condition that the property shall belong fully to the donee in case the donor dies as anticipated, leaving the donee surviving him, and the gift is not in the meantime revoked, but not otherwise. * * * To constitute a valid gift *causa mortis*, it must be made in view of the donor's impending death; the donor must die of the disorder or peril; and there must be a delivery of the thing given. The donor must be competent to make the gift; there must be an intent upon his part to do so; and an acceptance by the donee. * * *

The delivery must be such as is actual, unequivocal, and complete during the lifetime of the donor, wholly divesting him of the possession, dominion, and control thereof." *Weiss v. Fenwick,* 111 *N. J. Eq.* 385, 387–388 (*E. & A.* 1932).

 There is some doubt in the New Jersey cases as to whether as a result of a gift *causa mortis* the property remains in the donor until his death, *Weiss v. Fenwick, supra,* 111 *N. J. Eq.* 385, 389; *Jadzevicz v. Adams,* 122 *N. J. Eq.* 6, 8 (*E. & A.* 1937) ; *Borthwick v. Skurzynski,* 139 *N. J. Eq.* 520, 522 (*Ch.* 1947), affirmed 141 *N. J. Eq.* 363 (*E. & A.* 1948), or whether the transfer is considered absolute even though it is defeasible, *Meyers v. Meyers,* 99 *N. J. Eq.* 560, 562 (*Ch.* 1926) ; *Buchman v. Smith,* 137 *N. J. Eq.* 215, 219 (*E. & A.* 1945) ; 5 *Clapp, New Jersey Practice,* § 5. In any event, a gift *causa mortis* is essentially of a testamentary nature and as a practical matter the doctrine, though well established, is an invasion into the province of the statute of wills:

"Some *quasi*-testamentary acts,—such as gifts *causa mortis,* where delivery takes the place of the execution of a will,—may even enable essentially testamentary dispositions to be effected without compliance with the statutes governing wills. To be sure the delivery, actual or symbolic as the case may be, marks a gift *causa mortis* off from a strict testamentary disposition, but the revocable nature of the gift makes that distinction very slight, and in those jurisdictions where the title to the thing delivered as a gift *causa mortis* does not pass until the donor dies, the distinction becomes microscopic. Nevertheless the distinction is well established." *Costigan, Constructive Trusts,* 28 *Harv. L. Rev.* 237, at 240–241 (1915).

In *Jones v. Selby, Prec. Ch.* 301, 24 *E. R.* 143, 144 (1710), the Lord Chancellor noted that a *"donatio causa mortis * * * differs in nothing from a will."* Our Court of Chancery referred to it as "in effect an ambulatory and testamentary disposition," *Dunn v. Houghton,* 51 *A.* 71, 78 (*Ch.* 1902). To the same effect see *O'Mara v. Denlinger,* 271 *App. Div.* 22, 62 *N. Y. S. 2d* 282, 287 (*App. Div.* 1946) ; 4 *Page on Wills,* § 1660; note, 61 *Harv. L. Rev.* 542, 543 (1948) ; annotation 63 *A. L. R.* 537, 552; 38 *C. J. S., Gifts,* § 72.

In *Ward v. Turner, supra,* 2 *Ves. Sr.* 431, 28 *E. R.* 275, 279, Lord Chancellor Hardwicke said that "it was a pity that the Statute of Frauds did not set aside all these kinds of gifts." Lord Eldon expressed the opinion that it would be an improvement of the law to strike out altogether this peculiar form of gift, but since that had not been done, he felt obliged to "examine into the subject of it." *Duffield v. Elwes,* 1 *Bligh* (*N. S.*) 533, 4 *E. R.* 959, 972 (1827). Our own Vice-Chancellor Stevenson referred to it as "that ancient legal curiosity," *Dunn v. Houghton,* 51 *A.* 71, 78 (*Ch.* 1902), and then later said that such gifts are "dangerous things":

"These gifts *causa mortis* are dangerous things. The law requires, before Mr. Hitt can come into this court and claim $10,000 as an ordinary testamentary gift from Mrs. Thompson, that he should produce an instrument in writing signed by Mrs. Thompson, and also acknowledged with peculiar solemnity by her in the presence of two witnesses, who thereupon subscribed their names as witnesses. That is what Mr. Hitt would have to prove if he claimed a testamentary gift in the ordinary form of one-third of Mrs. Thompson's estate. And yet, in cases of these gifts *causa mortis,* it is possible that a fortune of a million dollars can be taken away from the heirs, the next of kin of a deceased person, by a stranger, who simply has possession of the fortune, claims that he received it by way of gift, and brings parol testimony to sustain that claim." *Varick v. Hitt,* 55 *A.* 139, 153 (*Ch.* 1903), affirmed 66 *N. J. Eq.* 442 (*E. & A.* 1904).

Gifts *causa mortis* are not favored in the law. As stated in *Buecker v. Carr,* 60 *N. J. Eq.* 300, 305 (*Ch.* 1900), "gifts *mortis causa* are not favored in the law, for the reason that this mode of disposition permits property without limit of value to be transferred by mere delivery, and the proof thereof to be made when death has closed the lips of the claimed donor." In *Parker v. Copland,* 70 *N. J. Eq.* 685, 691 (*E. & A.* 1906), the highest court of this State had this to say:

"Of all legal rules, however, those that have grown up around the doctrine of *donatio causa mortis* should be the least subject to relaxation. Formed, as these rules were at a period when personal property consisted for the most part of tangible chattels or private

choses in action, they have survived to do duty at a time when fortunes of unprecedented dimensions are evidenced solely by documents that fall within their operation and effect."

"Gifts *causa mortis* 'are not to be favored, as they conflict with the general policy of the law relating to the disposition of the estates of deceased persons,' " *McDonough v. Portland Savings Bank*, 136 *Me.* 71, 1 *A.* 2d 768, 769 (*Sup. Jud. Ct.* 1938) ; see *Dunn v. Houghton, supra,* 51 *A.* 71, 78; *Varick v. Hitt, supra,* 55 *A.* 139, 153; *Keepers v. Fidelity Title and Deposit Co., supra,* 56 *N. J. L.* 302, 308; *Madison Trust Co. v. Allen,* 105 *N. J. Eq.* 230, 233 (*Ch.* 1929), affirmed 107 *N. J. Eq.* 183 (*E. & A.* 1930) ; 5 *Clapp, supra,* § 5; 4 *Page on Wills, supra,* § 1662.

The first question confronting us is whether there has been "actual, unequivocal, and complete delivery during the lifetime of the donor, wholly divesting him [her] of the possession, dominion, and control" of the property, *Weiss v. Fenwick, supra,* 111 *N. J. Eq.* 385, 388; see *Cook v. Lum,* 55 *N. J. L.* 373 (*Sup. Ct.* 1893) ; *Stevenson v. Earl,* 65 *N. J. Eq.* 721 (*E. & A.* 1903) ; *Meyers v. Meyers, supra,* 99 *N. J. Eq.* 560; *Imparato v. Luscardi,* 123 *N. J. Eq.* 298, 300 (*Ch.* 1938) ; *Borthwick v. Skurzynski, supra,* 139 *N. J. Eq.* 520, 522; 5 *Clapp, supra,* § 4. In *Keepers v. Fidelity Title and Deposit Co., supra,* 56 *N. J. L.* 302, the question was whether the delivery of the key to a box containing valuable papers was sufficient delivery to constitute a valid gift *causa mortis* of the papers therein, when the box, which was not in the presence or immediate control of the donor, did not pass into the actual possession of the donee during the lifetime of the donor. Justice Dixon in his opinion for the court reviewed the English and American authorities, and then concluded that there had not been that delivery required under New Jersey law:

"The leading case on the subject of donations *mortis causa* is *Ward v. Turner*, 2 *Ves. Sr.* 431 (*A. D.* 1752), where Lord Chancellor Hardwicke laid down the rule, with reference to delivery, which has ever since formed the basis whereon such gifts are supported. After showing that the recognition of donations *mortis*

*causa* by the common law was derived from the civil law, he declared that the civil law had been 'received in England, in respect of such donations, only so far as attended with delivery, or what the civil law calls "tradition" '; that 'tradition or delivery is necessary to make a good donation *mortis causa*.' He further said: 'It is argued that; though some delivery is necessary, yet delivery of the thing is not necessary, but delivery of anything by way of a symbol is sufficient. But I cannot agree to that, nor do I find any authority for that in the civil law, which required delivery in some gifts, or in the law of England, which required delivery throughout. Where the civil law requires it, it requires actual tradition,—delivery over of the thing. So, in all the cases in this court, delivery of the thing given is relied on, and not in the name of the thing. * * * Yet,' he added, 'Notwithstanding, delivery of the key of bulky goods, where wines, etc., are, has been allowed as delivery of the possession, because it is the way of coming at the possession, or to make use of the thing.' "

"On this footing, it has in some instances been adjudged that delivery of the key was sufficient delivery for a valid donation *mortis causa* of money or documents locked in a trunk or other receptacle, not within the presence or immediate control of the donor, and not otherwise transferred to the possession of the donee. *Cooper v. Burr,* 45 *Barb.* [*N. Y.*], 9; *Marsh v. Fuller,* 18 *N. H.* 360; *Jones v. Brown,* 34 *N. H.* 439; *Thomas v. Lewis,* 89 *Va.* 1, 15 *S. E.* 389, 18 *L. R. A.* 170; *Phipard v. Phipard* [55 *Hun.* 433], 8 *N. Y. S.* 728; *Pink v. Church* [60 *Hun.* 580], 14 *N. Y. S.* 337. * * * We are not willing to approve the extreme views which have been adopted in the cases cited." (56 *N. J. L.* at *pages* 305–306, 307)

In *Cook v. Lum, supra,* 55 *N. J. L.* 373, our former Supreme Court stated that where choses in action were concerned, delivery of the "donor's voucher of right or title" would be sufficient:

"The general legal principle regulating the subject of gifts of choses in action has long been established. It is to the effect that with respect to things both tangible and intangible mere words of donation will not suffice. With regard to the former class,—that is things corporeal,—there must be, in addition to the expression of a donative purpose, an actual tradition of the *corpus* of the gift whenever, considering the nature of the property and the circumstances of the actors, such a formality is reasonably practicable. In some instances, when the situation is incompatible with the performance of such ceremony, resort may be had to what has been called a 'symbolical delivery' of the subject. Touching things in action, as there can be no actual delivery of them, the legal requirement is that the donor's voucher of right or title must be surrendered to the donee. Such surrender is deemed equivalent to an actual handing

over of things corporeal. To this extent the law of the subject is neither doubtful nor obscure. The difficulty supervenes as soon as the attempt is made to apply these rules to the ever variant conditions of the cases that are being presented for judicial examination. Even when the thing given has been a personal chattel, whether certain acts show a purpose to give consummated by a delivery of it has often been, and doubtless will be, a vexed question. The uncertainty in construing the circumstances is even greater when we have rights of action to deal with. There are a multitude of decisions which demonstrate the embarrassment inherent in this class of cases, but as these decisions, while all acknowledging the rules just indicated, are in truth nothing more than interpretations respectively of the facts of the particular case, and as such facts are unlike the juncture now present, it would serve no useful purpose to review or quote them in detail. There is no observed precedent, so far as circumstances are concerned, for the matter now before us. Many of these decisions may be found in the *Encyclopedia of English and American Law, tit. 'Gift,'* and any person who will examine this long train of cases will at once perceive that the principal difficulty has been to decide whether the evidence in hand in the given case showed a delivery of the subject of the gift in a legal point of view. But this was a maze not without its clue, for the cardinal principle as to what constituted a delivery that would legalize·a gift was on all sides admitted, and was generally applied. The test was this: that the transfer was such that, in conjunction with the donative intention, it completely stripped the donor of his dominion of the thing given, whether that thing was a tangible chattel or a chose in action." (55 *N. J. L.* at *pages* 374–376.)

Thus, under New Jersey law actual delivery of the property is still required except where "there can be no actual delivery" or where "the situation is incompatible with the performance of such ceremony." In the case of a savings account, where obviously there can be no actual delivery, delivery of the passbook or other indicia of title is required, *Pfeifer v. Badenhop,* 86 *N. J. L.* 492, 494 (*Sup. Ct.* 1914); *Bankers' Trust Co. v. Bank of Rockville Center Trust Co.,* 114 *N. J. Eq.* 391 (*E. & A.* 1933); *Borthwick v. Skurzynski, supra,* 139 *N. J. Eq.* 520, 523; *Hinchliffe v. Kastner,* 1 *N. J. Super.* 495 (*Ch. Div.* 1948); *Hoey v. Dell,* 10 *N. J. Super.* 185 (*App. Div.* 1950); annotations, 40 *A. L. R.* 1249, 84 *A. L. R.* 558.

Here there was no delivery of any kind whatsoever. We have already noted the requirement so amply established in our cases, *supra,* of "actual, unequivocal, and complete

delivery during the lifetime of the donor, wholly divesting her of the possession, dominion, and control" of the property. This requirement is satisfied only by delivery by the *donor*, which calls for an affirmative act on her part, not by the mere taking of possession of the property by the donee.

Delivery itself, which we have been considering, is to be distinguished from donative intent, another element in gifts *causa mortis*. As stated in *Madison Trust Co. v. Allen, supra,* 105 *N. J. Eq.* 230, 235, "the burden of proof is upon the alleged donee to clearly prove *both delivery and donative intent*" (emphasis supplied). This was clearly brought out by the court in *Parker v. Copland,* 70 *N. J. Eq.* 685 (*E. & A.* 1906):

"It necessarily follows from this that when a donor participates or concurs in a transaction, part of which is the retention by him, after the expression of his donative purpose of every existing indicium of dominion over that to which such donative purpose referred, an enforceable gift has not been legally established; and this is true without regard to the clearness or cogency with which the donative purpose may have been indicated, for, in the above citation it will be noted that the crucial test is not the strenuousness of the language in which the gift is couched, but in 'the transfer,' which is something that is both different from the donative intention and yet capable of acting in conjunction with it, so that both are necessary to the creation of an enforceable gift. The absence of either is as fatal to the gift as if both were lacking, just as a legacy may fail either because it is not found in the will or because the will itself is not legally executed. Indeed, an impressive illustration of this distinction would be the existence of a holographic will containing the most copious expressions of a donative intention, which, even though signed by the testator, would not in the least effectuate the purpose so expressed. This illustration, which for obvious reasons must not be pushed too far, serves to emphasize the point that, when two steps are required by law to complete a transaction, the excess of one cannot supply the lack of the other, a distinction not at all times regarded in the argument of the present appeal." (70 *N. J. Eq.* at *pages* 688–689.)

Thus, an informal writing such as we have here does not satisfy the separate and distinct requirement of delivery, but rather there must be such delivery of the property that the donor stands absolutely deprived of his control over it. In *In re Hughes,* 59 *L. T.* (*N. S.*) 586 (1888), the decedent

placed with his will a signed paper which stated: "I give all my insurance money that is coming to me to my wife * * * as well as 200 pound in bank." Although the writing clearly established the decedent's donative intent, the court held that the gift must fail because of the absence of delivery, Bowen, L. J., leaving no doubt as to his views:

"Where, as in the present case, there is no change of possession operating as an immediate transfer, the doctrine of *donatio mortis causa* is not applicable. If we decided otherwise, we should, in effect, be enabling persons to drive a coach and four through the Wills Act."

In *Pfeifer v. Badenhop, supra,* 86 *N. J. L.* 492, 494, the court stated:

"But there was, of course, no delivery of the deposit book in the present case; and we fail to find one decision, nor does counsel point us to any, where such a deposit passed by execution and delivery of a written paper which without the book would not obligate the bank to pay the money." (86 *N. J. L.* at *pages* 274, 494.)

See cases cited in 63 *A. L. R.* 537, 555, where the writer concludes that "as applied to writings other than deeds or sealed instruments, the weight of authority clearly favors the view that the writing is ineffective as a gift *causa mortis* without a delivery of the property."

We must not forget that since a gift *causa mortis* is made in contemplation of death and is subject to revocation by the donor up to the time of his death, it differs from a legacy only in the requirement of delivery. Delivery is in effect the only safeguard imposed by law upon a transaction which would ordinarily fall within the statute of wills. To eliminate delivery from the requirements for a gift *causa mortis* would be to permit any writing to effectuate a testamentary transfer, even though it does not comply with the requirements of the statute of wills.

█ Here we are concerned with three separate items of property—cash, a savings account represented by a bank passbook, and shares in a building and loan association represented by a book. There was no actual delivery of the cash

and no delivery of the indicia of title to the savings account or the building and loan association shares. Rather, the donor set forth in an informal writing her desire to give these items to the defendant. Although the writing establishes her donative intent at the time it was written, it does not fulfill the requirement of delivery of the property, which is a separate and distinct requirement for a gift *causa mortis*. The cash, passbook, and stock book remained at the decedent's home and she made no effort to obtain them so as to effectuate a delivery to the defendant.

We disagree with the conclusion of the Appellate Division that the donee already had possession of the property, and therefore delivery was unnecessary. Assuming, but not deciding, the validity of this doctrine, we note that the house was the property of the deceased and, although defendant resided there with her, he had no knowledge of the presence of this property in the house, let alone its precise location therein; therefore it cannot be said that he had possession of the property.

Unlike some other jurisdictions New Jersey has resisted efforts to extend the doctrine of gifts *causa mortis*, recognizing it as a dangerous encroachment upon the policy embodied in the statute of wills. The words of Justice Dixon in his opinion for the court in *Keepers v. Fidelity Title and Deposit Co., supra,* 56 *N. J. L.* 302, 308, are equally applicable here.

"We agree with the sentiment expressed in *Ridden v. Thrall*, 125 *N. Y.* 572, 26 *N. E.* 627 [11 *L. R. A.* 684], that 'public policy requires that the laws regulating gifts *causa mortis* should not be extended, and that the range of such gifts should not be enlarged.' When it is remembered that these gifts come into question only after death has closed the lips of the donor; that there is no legal limit to the amount which may be disposed of by means of them; that millions of dollars' worth of property is locked up in vaults the keys of which are carried in the owners' pockets, and that, under the rule applied in those cases, such wealth may be transferred from the dying owner to his attendant, provided the latter will take the key, and swear that it was delivered to him by the deceased for the purpose of giving him the contents of the vault,—the dangerous character of the rule becomes conspicuous. Around every other disposition

of the property of the dead, the legislative power has thrown safe-guards against fraud and perjury; around this mode the requirement of actual delivery is the only substantial protection, and the courts should not weaken it by permitting the substitution of convenient and easily-proven devices." (56 *N. J. L.* at *page* 308.)

Nor have our courts been alone in resisting further exten-sion of the doctrine of gifts *causa mortis*. In the 1951 revision of *Title* 3 of the *Revised Statutes of* 1937 our Legis-lature abolished nuncupative wills as well as oral wills of soldiers and sailors, *L.* 1951, *c.* 345. It would certainly be a contradiction of legislative policy if, in the face of the legis-lative abolishment of nuncupative wills, our courts were to extend the doctrine of gifts *causa mortis*, "which are essen-tially of the same character and equally liable to objection," *Schouler, On Wills, Executors and Administrators* (1915 *ed.*), at 336.

But it is argued that the decedent's note to her husband in the circumstances of the case was an authorization to him to take possession of the chattels mentioned therein which when coupled with his taking of possession thereof during her lifetime was in law the equivalent of the delivery required in the Roman and common law alike and by all the decisions in this State for a valid gift *causa mortis*. Without accepting this contention, it is to be noted that it has no application to the present case, because here at the time the defendant ob-tained her note the decedent was in the operating room under ether and, according to the finding of the trial court, *supra*,

"after the operation and until the date of her death on May 13, 1951 she was in a coma most of the time; was unable to recognize mem-bers of her family; and unable to carry on intelligent conversation. * * * Mrs. Reiss was never able to talk or converse after coming out of the operation until her death."

In these circumstances the note clearly failed as an authoriza-tion to the defendant to take possession of the chattels men-tioned therein, since at the time he took the note from the drawer the decedent was under ether and according to the findings of the trial court unable to transact business until

the time of her death. See *section* 122 of the *Restatement of the Law of Agency*:

"The authority of the agent to make the principal a party to a transaction is terminated or suspended upon the happening of an event which deprives the principal of capacity to become a party to the transaction or deprives the agent of capacity to make the principal a party to it."

and *comment (b)* thereunder:

"The power of the agent terminates although he has no notice of the principal's loss of capacity or of the event causing it. It also terminates although the contingency has been provided for and it has been agreed that the authority would not thereupon terminate."

See also *Matthiessen & Weichers Refining Co. v. McMahon's Adm'r*, 38 *N. J. L.* 536, 546 (*E. & A.* 1876); *Manufacturers Trust Co. v. Podvin*, 10 *N. J.* 199, 208 (1952).

The judgment of the Appellate Division of the Superior Court is reversed and the judgment of the Chancery Division of the Superior Court will be reinstated.

JACOBS, J. (with whom WACHENFELD and WILLIAM J. BRENNAN, JR., JJ., agree, dissenting). The decedent Ethel Reiss was fully competent when she freely wrote the longhand note which was intended to make a gift *causa mortis* to her husband Adam Reiss. On the day the note was written her husband duly received it, located the money and books in accordance with its directions, and took personal possession of them. Nine days later Mrs. Reiss died; in the meantime her husband retained his possession and there was never any suggestion of revocation of the gift. Although the honesty of the husband's claim is conceded and justice fairly cries out for the fulfillment of his wife's wishes, the majority opinion (while acknowledging that gifts *causa mortis* are valid in our State as elsewhere) holds that the absence of direct physical delivery of the donated articles requires that the gift be stricken down. I find neither reason nor persuasive authority anywhere which compels this untoward

result. See *Gulliver and Tilson, Classification of Gratuitous Transfers*, 51 *Yale L. J.* 1, 2 (1941):

"One fundamental proposition is that, under a legal system recognizing the individualistic institution of private property and granting to the owner the power to determine his successors in ownership, the general philosophy of the courts should favor giving effect to an intentional exercise of that power. This is commonplace enough, but it needs constant emphasis, for it may be obscured or neglected in inordinate preoccupation with detail or dialectic. A court absorbed in purely doctrinal arguments may lose sight of the important and desirable objective of sanctioning what the transferor wanted to do, even though it is convinced that he wanted to do it."

Harlan F. Stone, in his discussion of *Delivery in Gifts of Personal Property*, 20 *Col. L. Rev.* 196 (1920), points out that the rule requiring delivery is traceable to early notions of seisin as an element in the ownership of chattels as well as land; and he expresses the view that as the technical significance of seisin fades into the background, courts should evidence a tendency to accept other evidence in lieu of delivery as corroborative of the donative intent. See *Philip Mechem, The Requirement of Delivery in Gifts of Chattels*, 21 *Ill. L. Rev.* 341, 345 (1926). Nevertheless, the artificial requirement of delivery is still widely entrenched and is defended for modern times by Mechem (*supra*, at 348) as a protective device to insure deliberate and unequivocal conduct by the donor and the elimination of questionable or fraudulent claims against him. But even that defense has no applicability where, as here, the donor's wishes were freely and clearly expressed in a written instrument and the donee's ensuing possession was admittedly *bona fide*; under these particular circumstances every consideration of public policy would seem to point towards upholding the gift.

The delivery requirement has, for the most part, been applied in like fashion to gifts *causa mortis* and gifts *inter vivos*. See *Brown, Personal Property* (1936), 76, 137; *Atkinson, Wills* (1937), 157. *Cf.* 4 *Page, Wills* (1941), 757. And although some courts have suggested that stricter attitude is called for in gifts *causa mortis* than in gifts *inter*

*vivos,* other courts have adopted the opposite point of view. See, *e. g., In re Wasserberg* (1915), 1 *Ch.* 195; *Begovich v. Kruljac,* 38 *Wyo.* 365, 267 *P.* 426, 60 *A. L. R.* 1046 *(Sup. Ct.* 1928); *Devol v. Dye,* 123 *Ind.* 321, 24 *N. E.* 246, 7 *L. R. A.* 439 *(Sup. Ct.* 1890). In the *Begovich* case, *supra* [38 *Wyo.* 365, 267 *P.* 429], the court said:

"* * * gifts *causa mortis* are ordinarily resorted to by intending donors because the facilities for executing the more formal testamentary disposition are not available, or the death of the donor is so imminent in point of time as to preclude preparation of the formal documents. They are in their very nature emergency measures. Hence, though delivery cannot be dispensed with, since words may be easily misrepresented (*Drew v. Hagerty, supra* [81 *Me.* 231, 17 *A.* 63, 3 *L. R. A.* 230]), still we should naturally expect the courts to hold the requirements as to such delivery to be less strict than in connection with gifts *inter vivos,* and that, in fact, is the holding of at least any of the courts. *Meach v. Meach,* 24 *Vt.* 591; *Murphy v. Bordwell,* 83 *Minn.* 54, 85 *N. W.* 915, 52 *L. R. A.* 849, 85 *Am. St. Rep.* 454; *Scott v. Bank & Trust Co.,* 123 *Tenn.* 258, 130 *S. W.* 757; *Devol v. Dye,* 123 *Ind.* 321, 24 *N. E.* 246, 7 *L. R. A.* 439; *In re White's Estate,* 129 *Wash.* 544, 225 *P.* 415; *Innes v. Potter,* 130 *Minn.* 320, 153 *N. W.* 604, 3 *A. L. R.* 896; *Sharpe v. Sharpe,* 105 *S. C.* 459, 90 *S. E.* 34, 3 *A. L. R.* 891; *Pyle v. East,* 173 *Iowa,* 165, 155 *N. W.* 283, 3 *A. L. R.* 885; *Eaton v. Blood,* 201 *Iowa* 834, 208 *N. W.* 508, 44 *A. L. R.* 1516."

And in the *Devol* case, *supra,* the Indiana Supreme Court, through Chief Justice Mitchell, said [123 *Ind.* 321, 24 *N. E.* 248]:

"Expressions are sometimes found in the books to the effect that gifts *causa mortis* are not favored in law because of the opportunity which they afford for the perpetration of frauds upon the estates of deceased persons by means of perjury and false swearing; but gifts of the character of those in question are not to be held contrary to public policy, nor do they rest under the disfavor of the law, when the facts are clearly and satisfactorily shown which make it appear that they were freely and intelligently made. *Ellis v. Secor,* 31 *Mich.* 185. While every case must be brought within the general rule upon the points essential to such a gift, yet, as the circumstances under which donations *mortis causa* are made must of necessity be infinite in variety, each case must be determined upon its own peculiar facts and circumstances. *Dickeschied v. [Exchange] Bank,* 28 *W. Va.* [340] 341; *Kiff v. Weaver,* 94 *N. C.* 274. The rule requiring delivery, either actual or symbolical, must be maintained, but its application is to be militated and applied according

to the relative importance of the subject of the gift and the condition of the donor. The intention of a donor in peril of death, when clearly ascertained and fairly consummated within the meaning of well-established rules, is not to be thwarted by a narrow and illiberal construction of what may have been intended for and deemed by him a sufficient delivery. The rule which requires delivery of the subject of the gift is not to be enforced arbitrarily."

No helpful purpose would be served by further discussion of the history or wisdom of the delivery rule or its sympathetic or hostile application to gifts *causa mortis*; it would seem that under any reasoned point of view the particular facts *in the instant matter should be deemed to constitute the required delivery*. It must be remembered that the gift to Adam Reiss did not rest upon delivery of the note alone; it rested on the acknowledged fact that in accordance with the terms of the note the donee took physical possession of the donated articles and retained them until after the death of the donor. In his article on *Gifts of Chattels without Delivery*, 6 *L. Quar. Rev.* 446 (1890), Sir Frederick Pollock said:

"On principle it would seem that where A by word of mouth purports to give B a certain chattel, this will have the effect of a license to B to take that chattel peaceably wherever he may find it. For it would not be reasonable for A to treat B as a trespasser for acting upon A's expressed intention. The license is no doubt revocable until executed, and may be revoked either by the communication to B, by word or act, of A's will to that effect, or by A's death (which was the case of *Irons v. Smallpiece*) or perhaps by A's becoming insane. If without any revocation the license is executed by B taking possession of the chattel, then, it is submitted, the property is irrevocably transferred to B. There would be great and obvious inconvenience in holding otherwise."

Similarly, Stone, *supra*, at 198, noted that "If the donor make oral gift of a chattel in the donor's possession to the donee, and the donee avails himself of the donor's license to possess himself of the chattel, the gift then becomes complete" without further delivery. Page in his treatise on *Wills, supra*, at 759, states flatly that "If the donor authorizes the donee to take physical possession of the property in question and the donee takes such possession before the donor dies, the donee's

act in taking possession is sufficient delivery." Commonsensible decisions in England and in this country have applied these views to sustain gifts *causa mortis* where, as in the instant matter, the donee properly acquired possession before the donor's death. See *Cain v. Moon* (1896) 2 *Q. B.* 283; *Champney v. Blanchard*, 39 *N. Y.* 111 (1868); *Davis v. Kuck*, 93 *Minn.* 262, 101 *N. W.* 165 (*Sup. Ct.* 1904); *In re Gordon's Will*, 238 *Iowa* 580, 27 *N. W. 2d* 900 (*Sup. Ct.* 1947). *Cf. Brown, supra,* at 102; *Mechem, supra,* at 364.

The *Davis* case related to a *causa mortis* gift of a team of horses from a father to a son who lived with him; the court sustained a charge that where the donee and donor lived together, as in the case of husband and wife or parent and child, it was not necessary that the donated article be removed from the common residence and it was " 'sufficient if it appear that the donor has relinquished and the donee acquired a control of the property.' " See 101 *N. W.*, at *page* 166. In the *Champney* case the court, in sustaining a gift *causa mortis*, held that where the donee already had possession no further formal delivery was necessary. See 39 *N. Y.*, at *page* 116:

"Delivery of the subject-matter is, no doubt, essential to a gift, either *inter vivos* or *mortis causa*; but the object of delivery is to give possession, and, in this case, possession was already complete in the donee. No further delivery was necessary, nor was it possible, without first returning the property to the donor, that it might be redelivered to the donee, an idle and unmeaning ceremony."

To the same effect was the upholding of the gift *causa mortis* in the *Cain* case, where Justice Wills remarked (2 *Q. B.*, at 289):

"Suppose a man lent a book to a friend, who expressed himself pleased with the book, whereupon the lender, finding that he had a second copy, told his friend that he need not return the copy he had lent him; it would be very strange if in such a case there were no complete gift, the book being in the possession of the intended donee."

When Ethel Reiss signed the note and arranged to have her husband receive it, she did everything that could reasonably

have been expected of her to effectuate the gift *causa mortis*; and while her husband might conceivably have attempted to return the donated articles to her at the hospital for immediate redelivery to him, it would have been unnatural for him to do so. It is difficult to believe that our law would require such wholly ritualistic ceremony and I find nothing in our decisions to suggest it. The majority opinion advances the suggestion that the husband's authority to take possession of the donated articles was terminated by the wife's incapacity in the operating room and thereafter. The very reason she wrote the longhand note when she did was because she knew she would be incapacitated and wished her husband to take immediate possession, as he did. Men who enter hospitals for major surgery often execute powers of attorney to enable others to continue their business affairs during their incapacity. Any judicial doctrine which would legally terminate such power as of the inception of the incapacity would be startling indeed—it would disrupt commercial affairs and entirely without reason or purpose.

The New Jersey decisions dealing with gifts *causa mortis*, including the leading cases of *Cook v. Lum*, 55 *N. J. L.* 373 (*Sup. Ct.* 1893), and *Keepers v. Fidelity Title & Deposit Co.*, 56 *N. J. L.* 302 (*E. & A.* 1893), relied upon by the majority, do not bear on the actual issue presented in the instant matter. In the *Cook* case the court held that delivery of a slip of paper referring to a sum of money which the donor had on deposit did not constitute delivery of the deposit (see *Brown, supra*, at 183) ; the donee there did not take possession of the deposit before the donor's death. In the *Keepers* case the court held that delivery of the key to a box did not constitute delivery of its contents (see *Brown, supra*, at 95) ; the donee there likewise did not take possession of the contents before the donor's death.

In the *Cook* case [55 *N. J. L.* 373], Chief Justice Beasley set forth the supposedly controlling principles which have been followed in our later cases and which do not in anywise impair the validity of the gift in the instant matter. Thus he noted that "there must be, in addition to the expression

of a donative purpose, an actual tradition of the *corpus* of the gift whenever, considering the nature of the property and the circumstances of the actors, such a formality is reasonably practicable"; and further in his opinion he stated that "the test was this: that the transfer was such that, in conjunction with the donative intention, it completely stripped the donor of his dominion of the thing given." When the husband took possession of the donated articles in accordance with his wife's wishes and the decent dictates of the circumstances, he acquired complete dominion to the exclusion of the donor; in all justice this should satisfy the delivery requirement even in the eyes of those who adhere most technically to its ancient terms and tenor.

I would affirm the judgment of the Appellate Division.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT and BURLING—4.

*For affirmance*—Justices WACHENFELD, JACOBS and BRENNAN—3.